(No. 6190.   October 7, 1935.)

L. E. JOSLIN and SARAH M. JOSLIN, His Wife, Respondents, v. IDAHO TIMES PUBLISHING COMPANY, a Corporation, Appellant.

[53 Pac. (2d) 323.]

Chapman & Chapman, for Appellant.

Bothwell & Povey, for Respondents.

GIVENS, C. J.—January 6, 1934, at 4:30 P. M., Wesley Kirkman, carrying newspapers on a motorcycle for appellant, collided with respondent, L. E. Joslin, who was pumping up the left rear tire of his automobile on one of the principal business streets in Twin Falls, causing a multiple compound fracture of Mr. Joslin's leg between the knee and ankle. From a verdict and judgment in favor of respondents, appellant seeks relief on three grounds. First, that Kirkman was an independent contractor and not its servant; second, respondent, L. E. Joslin's, contributory negligence, and third, instructions given and refused.

While several points of difference between the relationship of master and servant, making the master responsible for the torts of the servant, and that of independent contractor, all of the authorities cited by both parties, and others, universally recognize the right to control the actions of the servant on the one hand in the performance of his duties, and the lack of right of control of the independent contractor in the performance of his services on the other, as being one of the essentially controlling factors.

The complaint alleged that Kirkman was at the time and place of the accident employed by appellant as its agent, servant and employee. The answer appropriately denied this and alleged the relationship was that of an independent contractor. Without going further as to the burden of proof, it was thus essential that the respondents at least make a

*prima facie* case. (*Axtell v. Northern Pacific Ry. Co.*, 9 Ida. 392, 74 Pac. 1075; *Magee v. Hargrove Motor Co.*, 50 Ida. 442, 296 Pac. 774; .39 C. J. 1355–1357.)

The evidence on this point consists solely of the testimony of Kirkman and his predecessor, Rice, paraphrased as follows:

(Wesley Kirkman on Direct Examination.)

"I was starting to deliver my papers as the accident occurred and presume that I was working for the Times on that day. Had been working approximately a week. Had no written contract for employment and couldn't say who hired me. Was hired under these conditions: Mr. Rice wanted to give up the route so I asked him if I could take it over from him, so he went and saw the officials at the Times office and they said it was all right so I went to work. The route covering the district between Twin Falls, Buhl and Castleford. I went to work about three o'clock in the afternoon. First saw that my mail was all ready, then wrapped my singles for each customer and after that was all done loaded it on the machine and left. I was using a motorcycle. At the Times I talked or dealt with Bill Moore the fellow who counted the papers out about getting my mail and papers and reported to him. Al Westergran called the Circulation Manager had charge of the work there. About the only dealing I had with him was to deliver the mail. I don't think I got my pay from him at all. All I got was starts and stops and customers; that is, people who subscribed and people I stopped to deliver the papers to. I got my list of customers from the office. I couldn't say from whom. I was paid a weekly salary of $14 that included the use of the motorcycle. There was no set time to deliver the papers; I was to start when the papers were ready, generally between three and four o'clock in the afternoon. It was an evening paper. I never had any conversation with Mr. Westergran about complaints. No complaints had come in concerning the delivery of the paper. My arrangement with Champ Rice and how I happened to go to work was he had hurt his leg and couldn't ride the machine, so he sold me the machine and gave me

the route and it was Champ who talked to the officials of the paper about it. I am not working for the paper now. I worked about four or five months. I had been working about a week prior to January 6, 1934. Al Westergran settled up with me when I got through work. I stopped because I didn't have any transportation. There were other boys working about the same time I did. There were about 23 or 24 routes. Two of us used motorcycles. I carried the papers in regular saddlebags on the back of the motorcycle. I think about 150 pounds. I made deliveries all along the road between the towns and stopped in the Post Offices in the towns and delivered a regular sack of mail, papers it was. When I went to work nothing was said about how I was to work, the only way I knew how it was decided or how I was going to know was through the office officials, I guess.''

(Cross-examination.)

''The motorcycle was my property and I paid for the gasoline. The Times did not instruct me where to purchase the gasoline. I purchased the tires and repairs that were necessary on the motorcycle. The Times did not tell me when or how to do that and never instructed me as to the method of transportation that I must have. I did not use a motorcycle the entire time I worked. I used my brother's car. I did not consult any official of the Times with regard to using the automobile. I supplied the gasoline, tires, and repairs for it and the Times did not instruct me where to get any of those articles or when or how to get them. I have had my brother substitute for me on this route and I paid him. I did not consult the Times about having him substitute for me or his pay. I understood that if I couldn't work or didn't want to work, I could supply a substitute at my own expense. The contract I had was to deliver papers along a specified route and for that I received a stated sum. I couldn't say for certain what that was based upon, but I found out since that it was based on the number of papers and the mileage and the conditions of the roads and other things. The route was enlarged while I was working there and my compensation increased.

"Q. Did Mr. Westergran, or any of the officers of the Times, instruct you as to the details of delivering these papers, Wesley?

"A. Well, in a way, yes.

"Q. Now, in what way did they instruct you to deliver them?

"A. Well, they were to be put in the Times' can.

"Q. That is, for the individual subscribers?

"A. Yes, sir.

"Q. And to put the packages in the post offices of the various towns?

"A. Yes, sir.

"Q. That was the only instruction?

"A. Yes, sir.

"They did not instruct me or make any requirements of me relative to the particular means of transportation I employed. The idea was for me to get the papers out to the subscribers and to the Post Offices in the various towns I passed through.

"Q. Did Mr. Westergran, or any other person connected with the Times, instruct you as to the manner in which you should travel in the delivery of these papers?

"A. Well, as to certain routes to take, yes.

"Q. That is, to take the route where the subscribers were?

"A. Yes, sir.

"Q. Well, I mean as to the rate of speed at which you traveled?

"A. No, sir.

"Q. Or the streets in the City of Twin Falls that you used in getting in and out of town on?

"A. No, sir.

"Q. Or any other towns—Filer and Buhl and Castleford?

"A. No, sir.

"I delivered packages or articles for others than the Times while operating this route. The Nordling Parts. They paid me. Nothing was said to me by Mr. Westergran or any of the officials of the Times about any transactions like that, they just let me know when there were packages to go down

to the different towns. The Nordling people would request them to let me know that they had something for me to take and I would get it and the Nordling people paid me. Mr. Westergran or anyone in the Times office would not object to me doing that. They never instructed me relative to taking other persons with me on this route, that was up to me. I understood the only thing they expected me to do was to get the papers out to the subscribers each evening on that particular route."

(Redirect examination.)

"My brother substituted for me several times, not prior to the time of the accident but afterwards. He got the papers from the counter from the fellow that counted the papers out. My salary was made out to me by check. After they made the addition to my route I received an additional $1.25. I think they figured the addition was nine miles. One of the Times solicitors told me that. He had gone out and gotten the subscribers. Mr. Westergran instructed me to deliver the papers there. I understood the arrangement was they were to give me more for longer routes. I understood that from the other routes that went out from the office. I made my first delivery to a town west of here, at Filer. I had to have my papers at Buhl before six o'clock because that was the time the Post Office closed and I would leave here when the papers were made up for me. I was delayed because of breakdowns in the machinery and things of that kind. I went beyond Buhl to Castleford and deposited some of my papers there in the Post Office and delivered others to the customers. I don't think that Al Westergran would tell me to stop at the Nordling Parts to get packages for delivery, they would just call up the office. They would send a slip down to me saying that there were some parts and for me to pick them up. I believe the parts on more than one occasion prior to January 6th were for the Curtiss Chevrolet at Buhl. The Nordling Parts paid me twenty-five cents a package for such deliveries. I did not deliver for anyone besides Nordling Parts Co. I delivered for them at various times during the period I was carrying the route and did not report the amount

of money I received from them to Mr. Westergran or any officers of the Times. They would not inquire about that. The only instruction I had from Mr. Westergran or from the Times was as to where the papers on my route were to be delivered and the time when they desired to have them delivered.''

(Champ Rice on Direct Examination.)

''I don't know who employed me, I just started delivering papers there. Kind of got my instructions from Al Westergran. I had no written contract with them, just a kind of an oral contract or agreement to deliver the papers down there for them. Nothing was said about using my motorcycle. I usually delivered with the motorcycle, and when there was something wrong with that I drove my car. I told Al Westergran about Wesley Kirkman going to work. I told him I couldn't take the route any more, and asked if it would be all right for Wesley to deliver the papers, that I thought he would do a good job. *He said it would be all right if he did a good job.* I told him I would see that Wesley did the job all right and I thought he would. Nothing was said about the salary he was to get at that time. I was getting $14 a week and took care of all expense and bought my own equipment. The $14 included my time and the use of my automobile or motorcycle, and I paid for the gasoline and up-keep. When I first took over the route I took it from the man before me and I learned the route from him. There was one small change in the route during the time I was taking it. There were a few customers added from time to time and I found out where to deliver those by receiving a slip of paper down at the newspaper office telling me of the start, if I got a new subscription, or telling me of the stop if someone's subscription run out and they didn't care to have it renewed. The slips just came from the office. I went to work between three and four o'clock in the afternoon, and had the papers in Buhl before six o'clock that same evening, because the Post Office closed at six and I had to have the papers in there so they could put them up. They quit work at six o'clock in the Post Office. A motorcycle or an automobile was the only

way of transportation that I had to go by to get down there before that time. Wesley Kirkman had been working about a week on the 6th of January, 1934. Before that time I had gone around with him to show him the route. He was using a Harley-Davidson motorcycle on the 6th day of January, 1934. I owned the motorcycle before that but sold it to Wesley. I sold him the motorcycle and he was to take over the route—my route—and deliver the papers and pay me the —make me payments on the motorcycle with part of his money that he got from the route. I saw Wesley at the time he left the Times building on the 6th of January, 1934. I was at the Times. He was not having any difficulty with the motorcycle, no more than it was cold; it was running. It was cold like a car would be from sitting down there back of the office; it was working then. I did not see the accident. I did not see him when he left the alley, when he came out there on to Second Street. I saw him next after seeing him back of the Times building going around the corner at the Taylor Service Station down on Second Avenue East. I saw him turn around the corner where he had the accident but didn't see the accident. I was two blocks south and saw him down the street as I was crossing the intersection there by the Arrow Head Service Station. I wanted to see him and I went to the scene of the accident after it happened. There was nothing wrong with the ignition on the motorcycle at that time.''

(Cross-examination.)

''There was nothing said to me at the time I took over this route by Mr. Westergran or any of the officials of the Times, as to the means of transportation that I would have to have. I had substitutes on the job when I had the route, and I paid them. I did not consult Mr. Westergran or the Times about putting on substitutes. I furnished all of the gasoline and repairs and tires for the motorcycle, and the Times did not direct me where to procure those things, or in what manner or when. The Times did not furnish the automobile that I used nor any of the gasoline or tires or repairs on it; I did that. They did not instruct me in any way concerning either

the handling of the motorcycle or the automobile, nor the manner of transportation that I used in delivering their papers along the route I served. I delivered packages or parcels along this route for Nordling Parts. I have brought parts from the Curtiss Chevrolet Co. from Buhl up here; and things from Shelley Hard to the Western Cyclery here, and taken things from the Western Cyclery here down there, and several other things from the time I took the route, but that is all I remember. I received compensation for those things usually—well, for the Nordling Parts and things like that, it was paid on the other end by the parties receiving the parts; but something like bringing something from Shelley Hard, down there to have it fixed down here, he always paid me. The Times never paid me for carrying that kind of parcel or package, and never objected to my carrying such things. Mr. Westergran or any of the officials of the Times did not instruct me not to carry anything other than their papers, nor required me to account to them for the moneys received by me for carrying packages for other persons. Wesley Kirkman had been going over this route with me before the first of January of this year around two weeks, something like that. *Mr. Westergran told me he could work the same as me if he made good.* The only things that the Times ever instructed me about was as to the places *where* I was to deliver the papers and the *time when* it should be done. My route was changed a little during the time I covered it. I believe I received a change in compensation on account of the change in the route. It was decreased as the number of miles were cut down.''

(Redirect examination.)

''Whenever any of us got a complaint, we would get our papers from the boy who counts the papers out to us, and the starts and stops and complaints are all in one package, and they had the route number or the route name at the bottom of the slip, and we would look through and find the one with our name on it, and, if we had any that was for us. I had one or two during the time I worked there, and I talked to either Al Westergran or George Taylor about them.

I worked there about two and a half years steady. I was discharged once when I was smaller by Al Westergran because I went fishing instead of going down and checking over my route with him and George Taylor one Saturday morning. Al said I could have another job there. I lost my route."

(Recross-examination.)

"That was not this same route, it was a bicycle route that kind of went out of town a ways, but is really in town now. That was before I ever covered a motorcycle or an automobile route, and when I was a young boy. The complaints sometimes related to the manner in which I delivered the papers. Complaints from subscribers that were not getting their papers. That is all they related to."

Determining the terms of employment from the testimony of both, the essential features were: service for a weekly wage, the delivery of the papers to certain individual subscribers between Twin Falls and Castleford, and at the postoffices, at Buhl before six o'clock in the afternoon, and at Castleford. Kirkman was to furnish his own means, methods, and manner of conveyance without restriction or supervision as to the kind, character, or use thereof, and except as it was necessary to deliver at the specified places and within the required time, on any route and within such time and at such speed as he desired, and could and did deliver for others and did and had the right to employ substitutes. There is nothing in the testimony of either of these witnesses as to either the right or conditions for discharge. The testimony with regard to the previous discharge of Rice being as to a different kind of employment and on a different kind of route and for a cause not connected so far as the evidence discloses, with the manner or method of conducting the route. The nearest approach to evidence of control is the statement in Rice's testimony that Westergran said:

"It would be all right (for Kirkman to go to work) if he (Kirkman) did a good job."

And again:

"Mr. Westergran told me he (Kirkman) could work the same as me if he made good."

The testimony of both boys shows that instructions were given as to what they were to do, where they were to do it, when they were to do it, but not *how,* and respondents themselves thus state the rule quoting from 39 C. J. 35, section 4:

"The relation of master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, not only what shall be done, but *how* it shall be done." (Italics ours.)

*Taylor v. Blackwell Lumber Co.,* 37 Ida. 707, 218 Pac. 356; *E. T. Chapin Co. v. Scott,* 44 Ida. 566, 260 Pac. 172; *Horst v. Southern Idaho Oil Co.,* 49 Ida. 58, 286 Pac. 369.

The right to control must not be merely as to the accomplishment of the work but it must be as to the mode and means of performance. (*Messmer v. Bell & Coggeshall Co.,* 133 Ky. 19, 117 S. W. 346, 19 Ann. Cas. 1; *Covington & Cincinnati Bridge Co. v. Steinbrock,* 61 Ohio St. 215, 55 N. E. 618, 76 Am. St. 375; *Alexander v. R. A. Sherman's Sons Co.,* 86 Conn. 292, 85 Atl. 514; *Western Indemnity Co. v. Pillsbury,* 172 Cal. 807, 159 Pac. 721; *Good v. Johnson,* 38 Colo 440, 88 Pac. 439, 8 L. R. A., N. S., 896; *Atlanta & Florida R. R. Co. v. Kimberly,* 87 Ga. 161, 13 S. E. 277, 27 Am. St. 231; note, 65 L. R. A. 445, at 478; 31 C. J. 473–475.)

*Barton v. Studebaker Corporation of America,* 46 Cal. App. 707, 189 Pac. 1025, at 1028, held:

"No better description of an independent contractor or a person who is engaged in performing certain acts or work for another but who, in performing such acts or work, exercises an independent calling—that is, a calling as to the means or methods of accomplishing the ends of which no right of control or direction is reserved to or vested in or exercisable by the party for whom the acts or work are to be done—is to be found than is given in *Green v. Soule,* 145 Cal. 96, 99, 100, 78 Pac. 337, 339, as follows:

" 'An independent contractor is one who, in rendering services, exercises an independent employment or occupation, and represents his employer only as to the results of his work, and not as to the means whereby it is to be accomplished.

. . . . The chief consideration which determines one to be an independent contractor is the fact that the employer has no right of control as to the mode of doing the work contracted for. 16 Am. & Eng. Ency. of Law (2d Ed.) p. 187. The fact that the work is to be done under the supervision of an architect, or that the employer has the right to make alterations, deviations, additions, and omissions from the contract, does not change the relation from that of an independent contractor to that of a mere servant. 16 Am. & Eng. Ency. of Law (2d Ed.) p. 187; *Frassi v. McDonald*, 122 Cal. 402, 55 Pac. 139, 772. These principles apply ''likewise in favor of the principal contractor as against any liability on his part for the acts of a subcontractor, or of a subcontractor's servants.'' 16 Am. & Eng. Ency. of Law (2d Ed.) p. 194, and cases cited.' ''

In *Watson v. Hecla Min. Co.*, 79 Wash. 383, 140 Pac. 317, at 318, Ann. Cas. 1916A, 279, the court said:

''In the Larson Case, *supra* (*Larson v. American Bridge Co.*, 40 Wash. 224, 82 Pac. 294, 111 Am. St. 904), the rule is stated in this language: 'The general test which determines the relation of independent contractor is that he shall exercise an independent employment, and represent his employer only as to the results of his work, and not as to the means whereby it is to be accomplished. The chief consideration is that the employer has no right of control as to the mode of doing the work; but a reservation by the employer of the right to supervise the work, for the purpose of merely determining whether it is being done in accordance with the contract, does not affect the independence. of the relation.' ''

The court said in *Indiana Iron Co. v. Cray*, 19 Ind. App. 565, 48 N. E. 803, at 807:

''It has been said that the test is, who has the general control of the work? Who has the right to direct what shall be done, and how to do it? See Wood, Mast. & Serv. § 314. It was held in *Kelly v. Mayor, etc.*, 11 N. Y. 432, that when the person employing may prescribe what shall be done, but not how it is to be done, or who is to do it, the person so employed is a contractor, and not a servant. . . . . . The fact that the work is to be done under the direction and to the

satisfaction of certain persons representing the employer does not of itself render the person contracted with to do the work a servant."

Appellant urges *Gall v. Detroit Journal Co.*, 191 Mich. 405, 158 N. W. 36, 19 A. L. R. 1164, as controlling in its favor; there, however, a written contract expressly creating the relationship of indêpendent contractor was construed. Respondents rely strongly upon *Wilson v. Times Printing Co.*, 158 Wash. 95, 290 Pac. 691; there are, however, decidedly distinguishing features between that case and this; first, the employee testified that his employer told him that if he did not get his papers around or delivered he would be discharged, and that he was admonished "to keep them from sending in complaints," likewise that the company furnished him blank receipts:

" . . . . to be given to the subscribers upon their paying him for their subscriptions, which blank receipts concluded with the printed words, 'Received payment for the company,' followed by a blank line for Maxwell's signature."

And further the carrier received more specific and detailed instructions as to how he was to deliver the papers and one of the officers of the company testified:

"I have general overseeing of these route carriers and I check up on them all the time to see that they do the work properly. I hire them and fire them. From time to time we sent out solicitors over the routes. When a boy's route comes down a little he has the right to notify the office that he wishes a man sent out. From time to time we gave Maxwell a list of new subscribers to deliver papers to. We tell the driver to deliver it (the paper) where they (subscribers) wish it. I do not remember any place Maxwell was told to deliver a specified paper outside of the usual delivery in the mail boxes. When the subscriber asks for it to be delivered on the porch instead of in the mail box we personally go out and see the subscriber, and if we think the subscriber's request is within reason, we ask that the boy comply with the request. We expect him to comply with every request that is within reason."

The court enumerated six premises as follows:

"(1) Appellant retained at least some substantial measure of control over Maxwell in the performance of his work under the contract. (2) The work under the contract was not to continue for any specified time; either Maxwell or appellant could terminate the contract relationship at any time. (3) Maxwell's earnings under the contract were, at least partly, in the form of stated monthly wages or salary, though his net earnings under the contract seem to have been largely in the commission on the amount of business he did. (4) It was by the contract plainly contemplated that Maxwell was to personally do all that the contract contemplated to be done by him thereunder, rather than by his employment of others to do the work. (5) Maxwell did not contract to produce only a defined certain physical result, the means or manner of doing which were wholly of his own choosing; he was to, and did, work to the end, not only of merely physically delivering the papers, but delivering them in such manner as to promote the good will of appellant and in such manner as he might be directed from time to time by appellant's superintendent. (6) Maxwell was furnished blank receipts to be filled out and given by him to the subscribers for payment of their monthly subscriptions, indicating upon their face that 'he received payment for the company.'"

The fourth, and sixth, of which are lacking herein.

In *Press Pub. Co. v. Industrial Acc. Com.*, 190 Cal. 114, 210 Pac. 820, two points were considered by the court as apparently essential to establish the relationship of master and servant, direct testimony that the employee was subject to be discharged at any time his service should prove to be unsatisfactory, and that the services were to be rendered by the employee himself and not by a substitute—not the situation herein. It might be legitimate to infer that in the case at bar the right of discharge existed, but there is no evidence on which to base even an inference of the right of control as to the means, method or manner of doing the work. There was therefore not sufficient evidence to support the jury's evident conclusion necessary to sustain the verdict that the relationship of master and servant existed. The question of

contributory negligence as well as the other questions in the case were properly left for the jury's determination under instructions which as against appellant's criticism thereof were substantially correct.

Judgment reversed and the cause remanded for a new trial. Costs to appellant.

Budge, Morgan, Holden and Ailshie, JJ., concur.

### ON REHEARING.

(January 11, 1936.)

GIVENS, C. J.—A petition for rehearing was filed by respondents which may be summed up as challenging the correctness of the original opinion in holding that there was not sufficient evidence to sustain the verdict against appellant under the doctrine of *respondeat superior*, and that the court had not given consideration to the asserted presumption that one found in the employment of another is deemed a servant and not an independent contractor, graciously conceding that this presumption had not been particularly adverted to by counsel upon the first hearing.

The court granted a rehearing on two questions which it thought would focus the conflicting views and contentions as follows:

I.

"Where it is established or conceded a party is working in some capacity for another, whether there arises a presumption that he is an employee and not an independent contractor?

II.

"Whether the burden of proof is upon the party to the action asserting that the employment is that of an independent contractor and not that of a mere employee, even though the plaintiff's case must rest upon the proposition that the employment is not that of an independent contractor?"

Taking up the first question, respondent cites authority which supports the proposition under these phases

that there is the presumption indicated in the question. (39 C. J. 52, sec. 28; 16 Cal. Jur. 1111, sec. 67; 13 Cal. Jur. 1041, sec. 17.) The presumption of relationship of master and servant exists where the alleged servant is working on the premises of the master. (14 R. C. L. 78, sec. 15; *Simila v. Northwestern Improvement Co.*, 73 Wash. 285, 131 Pac. 831; *Oklahoma City Const. Co. v. Peppard*, 43 Okl. 121, 140 Pac. 1084; *Dibble v. San Joaquin Light & Power Corp. et al.,* 47 Cal. App. 112, 190 Pac. 198; *Fulton Inv. Co. v. Farmers' Reservoir & Irr. Co.*, 76 Colo. 472, 231 Pac. 61; *Murrays' Case*, 130 Me. 181, 154 Atl. 352, 75 A. L. R. 720.) And where the alleged servant is not on the premises, but driving a vehicle belonging to the employer. (*Hinds v. Department of Labor*, 150 Wash. 230, 272 Pac. 734, 62 A. L. R. 225; *Dr. Pepper Bottling Co. v. Rainboldt*, (Tex. Civ. App.) 40 S. W. (2d) 827, 66 S. W. (2d) 496; *Commercial Credit Co. v. Groseclose*, (Tex. Civ. App.) 66 S. W. (2d) 709); and although the facts are none too clear, where he is neither on the premises nor using the owner's vehicle (*King v. Hercules Powder Co.*, 39 Cal. App. 223, 178 Pac. 531).

Herein the alleged servant or employee was neither working on the asserted master's or employer's premises nor using his appliances, the motorcycle belonging, under a contract of sale from Rice, to Kirkman. The basis for this presumption as announced in the authorities is therefore weak herein, but for the purpose of this discussion only, conceding the correctness of this presumption does not completely solve the problem because we find the further rule, well supported by reason and authority that if the evidence produced by the party relying upon the presumption disputes or negatives the presumption, the presumption cannot avail in his favor. (*King v. Hercules Powder Co., supra; Dibble v. San Joaquin Light & Power Corp., supra; Gaffney v. Atchison, T. & S. F. Ry. Co.*, 107 Kan. 486, 192 Pac. 736; *Mar Shee v. Maryland Assur. Corp.*, 190 Cal. 1, 210 Pac. 269; *Hanchett v. Wiseley*, 107 Cal. App. 230, 290 Pac. 311; *Rogers v. Interstate Transit Co.*, 212 Cal. 36, 297 Pac. 884, 284 U. S. 640, 52 Sup. Ct. 22, 76 L. ed. 545; *Smellie v. Southern Pac. Co.*, 212 Cal. 540,

299 Pac. 529; *Fortier v. Hogan,* 115 Cal. App. 50, 1 Pac. (2d) 23; *Bushnell v. Tashiro,* 115 Cal. App. 563, 2 Pac. (2d) 550; *Peters v. Cal. Building & Loan Assn.,* 116 Cal. App. 143, 2 Pac. (2d) 439, at 444; *Pitt v. Southern Pac. Co.,* 121 Cal. App. 228, 9 Pac. (2d) 273; *Friddle v. Southern Pac. Co.,* 126 Cal. App. 388, 14 Pac. (2d) 568; *Garrison v. Williams,* 128 Cal. App. 598, 17 Pac. (2d) 1072; *Kerner v. Peacock Dairies,* 129 Cal. App. 686, 19 Pac. (2d) 283; *Hirsch v. D'Autremont,* 133 Cal. App. 106, 23 Pac. (2d) 1066; *Morris v. Purity Sausage Co.,* 2 Cal. App. (2d) 536, 38 Pac. (2d) 193; *Hoffman v. Lasseff,* 110 N. J. L. 122, 164 Atl. 293.)

In *Maupin v. Solomon,* 41 Cal. App. 323, 183 Pac. 198, at 199, the *per curiam* opinion of the supreme court denying a rehearing following the decision of the district court of appeals analyzed a similar situation as follows:

"In denying the petition for hearing in this court after decision by the District Court of Appeal of the First appellate district, division 1, we desire to point out that respondent's *prima facie* case was based solely on an 'inference,' and not on any 'presumption' declared by law. When we say that a certain inference is warranted by certain facts proved, we mean no more than that the jury is reasonably warranted in making that deduction from those facts. Section 1958, Code Civ. Proc. In this case the direct uncontradicted evidence introduced in response to the *prima facie* case as to the circumstances under which the employe of appellant was driving appellant's automobile was of such a nature as to leave no reasonable ground for an inference, based solely on the fact of appellant's ownership of the automobile, and the further fact that the person driving was an employe of appellant, that the driver was acting within the scope of his employment at the time of the accident. The verdict therefore was contrary to the evidence, and this is all we understand the opinion of the District Court of Appeal to decide.

"The application for a hearing in this court is denied."

This analysis is on all-fours in principle with the situation herein, holding to the effect, namely, as we now hold as we did in the original opinion, and no further, that there was

not sufficient evidence to support the jury's conclusion that the relationship of master or employer and servant or employee existed, because as to the subject matter of the second question we may concede, without deciding, which we do not, that where a person asserts as a defense to an action as against the alleged master or employer for the alleged negligence of the servant or employee that the true relationship was that of independent contractor, the burden of proof will be on the defendant to establish such relationship, but nevertheless in the first instance the respondents alleged that the appellant herein was the employer or master of Kirkman and that Kirkman was its servant and employee; the burden of proof, therefore, as to this allegation rested upon appellant, and if plaintiffs' own evidence showed that the relationship was not that of master and servant then he of course did not make a *prima facie* case, and the defendant would be entitled to a nonsuit.

We did not hold in the original opinion nor do we now hold that the relationship was that of independent contractor, merely that plaintiffs' own testimony did not show the relationship to be that of master and servant, this being so because even though full effect is given the presumption contended for, the testimony of plaintiffs' own witnesses, Rice and Kirkman, overthrew the presumption. The original opinion herein is therefore adhered to.

Budge, Holden and Ailshie, JJ., concur.

Morgan, J., dissents.