Ramón Montaner, en su carácter de Administrador del Fondo del Seguro del Estado, recurrente, *v.* Comisión Industrial de Puerto Rico, compuesta de los Sres. M. León Parra, Presidente, y F. Paz Granela y Juan M. Herrero, Comisionados Asociados, demandada; y Juan de Dios Rivera, peticionario ante la Comisión.

Núm. 186.—*Sometido:* Enero 22, 1940. *Resuelto:* Julio 9, 1940.

*Hon. Procurador General George A. Malcolm (E. Campos del Toro, Ex-Procurador General Interino,* en el alegato), *R. Rodríguez Ramos, Procurador General Auxiliar* y *Víctor J. Vidal González* y *G. Atiles Moréu,* Asesores Legales los dos últimos del Fondo del Estado, abogados del recurrente; *M. A. Casiano* y *Virgilio Brunet,* abogados del peticionario ante la Comisión.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

En el mes de octubre de 1936 West India Oil Co. tenía establecida una estación de servicio de gasolina en el pueblo de Morovis bajo la dirección de Manuel Díaz, Jr. De acuerdo con el contrato que existía entre ellos, Manuel Díaz, Jr. venía obligado a pagar el arrendamiento del local ocupado por la estación y a vender allí los productos de la compañía. Ésta, a su vez, estaba obligada a suministrar tanques, bombas y demás artefactos necesarios para el funcionamiento del puesto, obligándose además la compañía a arreglar por su cuenta los desperfectos del equipo y en caso necesario suplirlo por otro nuevo. Para la fecha indicada, hubo necesidad de trasladar el puesto de gasolina a otro local en el mismo pueblo, por lo que tuvieron que sacar el tanque del puesto donde estaba, para llevarlo al nuevo local, y durante la noche del día en que fué sacado para colocarlo al día siguiente, una mano criminal le hizo un taladro, sin que fuese advertido por nadie. Después de colocado el tanque en el nuevo local se observó que la gasolina se escapaba. Se avisó entonces a la West India Oil Co. y vino su agente del distrito a que pertenecía Morovis, el Sr. Juan N. Sotomayor. Ordenó éste que se sacara el tanque y al advertir el taladro, dijo que avisaría a la compañía a San Juan para que viniese su mecánico a arreglarlo; pero enterado luego de que Antonio Rivera tenía

un taller de herrería en Morovis y que sólo cobraría de $2 a $3, más o menos, por el trabajo (R. págs. 30 y 31), contrató con Antonio Rivera el trabajo. Ordenó Sotomayor que pusieran el tanque cerca de la boca de incendio para que estuviese recibiendo agua toda la noche, de manera que al día siguiente pudiesen proceder a efectuar la soldadura. El día señalado al efecto vino el mecánico Antonio Rivera a hacer el trabajo auxiliado por su sobrino Juan Ciro Rivera y de su hijo Artemio Rivera. Cuando este último aplicó el soplete para hacer la soldadura, explotó el tanque, causando, entre otras desgracias, la muerte de Juan Ciro Rivera.

Artemio Rivera empleaba menos de cuatro obreros en su taller y no estando comprendido en la Ley de Compensaciones por Accidentes del Trabajo, no estaba asegurado a los efectos de dicha ley. West India Oil Co., por el contrario, era un patrono asegurado en el Fondo del Seguro del Estado, por lo que Juan de Dios Rivera, padre del interfecto, reclamó del Fondo del Estado la compensación correspondiente por la muerte de su hijo.

El Administrador denegó la compensación solicitada. Recurrió entonces el peticionario a la Comisión Industrial y ésta, por decisión de 10 de marzo de 1939, desestimó la apelación, confirmando la decisión del Administrador del Fondo del Seguro del Estado. Solicitó después reconsideración el padre del obrero, y la Comisión Industrial reconsideró su decisión de 10 de marzo y dictó otra el 20 de octubre de 1939 por la que declaró compensable el accidente sufrido por el obrero y ordenó al Administrador que pagase al peticionario la indemnización provista por la ley. De esta resolución recurrió el Administrador para ante este tribunal, imputando a la Comisión tres errores, a saber:

"1. La Comisión Industrial cometió error al resolver que entre Antonio Rivera y la West India Oil Company mediaban relaciones de patrono y contratista independiente.

"2. La Comisión Industrial de Puerto Rico cometió error al resolver que el trabajo llevado a cabo por Antonio Rivera no era

uno de los expresamente exceptuados por el artículo 2 de la ley supra, por ser de carácter accidental o casual y no estar cubierto dentro del negocio, industria, profesión u ocupación de su patrono. .

"3. Asumiendo para la discusión, sin aceptar en modo alguno, que Antonio Rivera fuera el contratista independiente a que se refiere la ley, y Juan Ciro Rivera un trabajador de este contratista independiente, alegamos que la Comisión Industrial cometió error al resolver que Juan Ciro Rivera tenía derecho a la protección del estatuto habiéndose probado fuera de toda duda y no habiendo contención alguna en cuanto al hecho de que Antonio Rivera no estaba obligado a asegurarse por no emplear cuatro o más trabajadores de los comprendidos en la Ley."

La Ley de Compensaciones por Accidentes del Trabajo, aprobada en 18 de abril de 1935 (Leyes de ese año, (1) pág. 251), en sus secciones 2, 19 y 38, en lo pertinente prescribe:

"Art. 2. Las disposiciones de esta Ley serán aplicables a todos los obreros y empleados que trabajen para los patronos a que se refiere el párrafo siguiente . . . Se exceptúan expresamente aquellos obreros y empleados dedicados al servicio doméstico y *aquéllos cuya labor sea de carácter accidental o casual y no esté comprendida dentro del negocio, industria, profesión u ocupación de su patrono* y además aquellas personas que trabajen en sus domicilios.

"Art. 19. Todo patrono asegurado al dar cuenta con sus nóminas anuales, deberá incluir en tales nóminas los salarios pagados a todos los obreros y empleados que estuvieren trabajando o fuere a emplear bien por ajuste, o ya bajo una persona con quien ajustó el patrono o bajo un contratista ·o subcontratista independiente empleado o contratado por dicho patrono, y toda cuenta, o impuesto cobrado por el Estado se basará sobre la nómina corriente del patrono, en las cuales deberán estar incluídos los trabajadores antes mencionados; *Disponiéndose, que esta disposición no será aplicable a los patronos para quienes se hiciere trabajo por un contratista independiente que estuviere asegurado como patrono de acuerdo con las disposiciones de esta Ley.*

"Art. 38. Se entiende por 'obrero' o 'empleado' toda persona al servicio de cualquier individuo, sociedad o corporación que emplee regularmente obreros comprendidos bajo las disposiciones de esta Ley; *Disponiéndose,* que se excluyen expresamente los obreros y empleados dedicados al servicio doméstico y *aquéllos cuya labor sea de un carácter accidental o casual* y no esté comprendida dentro del

negocio, industria, profesión u ocupación, aquéllos que trabajen en sus domicilios, y los de patronos exentos de las obligaciones de esta Ley.

" *     *     *     *     *     *     *

" 'Carácter accidental o casual', lo que constituye un trabajo accidental o casual lo determinará la Comisión Industrial por reglamento aprobado por el Gobernador de Puerto Rico, tomando en cuenta la clase de trabajo que se realiza, el costo que representa el mismo al patrono, el período de duración de dicho trabajo, y principalmente su relación con el negocio o industria del patrono del obrero o empleado que sufre el accidente."

No habiendo contratado directamente la West India Oil Co. a Juan Ciro Rivera para que trabajase para ella, y resultando de la prueba que Antonio Rivera no era un patrono asegurado y que empleaba en su taller menos de cuatro obreros, las cuestiones suscitadas en este recurso de revisión se reducen a dos, a saber:

1. ¿Era Antonio Rivera un contratista independiente con respecto a la West India Oil Co.?

2. En caso de que lo fuera, ¿era el trabajo en cuestión de carácter casual o accidental, no comprendido dentro del negocio u ocupación a que se dedicaba la West India Oil Co.?

█ Conforme resulta de la prueba que tuvo ante sí la Comisión Industrial, Antonio Rivera hacía el trabajo bajo su propia dirección, seleccionaba sus auxiliares y no estaba sujeto a ser dirigido por la West India Oil Co. o sus agentes en cuanto a la forma de efectuar la soldadura.

En la obra *"Words and Phrases"* (*Permanent Edition*, 1940, tomo 9, págs. 329 *et seq.*), se citan, entre otras, las siguientes definiciones de la palabra "contratista", en distinción de la de la palabra "empleado":

"Cuando la persona que emplea a otra puede prescribir lo que se ha de hacer, pero no cómo ha de hacerse ni quién lo hará, la persona que se obligue a hacer el trabajo es un 'contratista' (*contractor*) y no un 'empleado' (*servant*), aunque el trabajo haya de realizarse bajo la dirección y a satisfacción de personas que representan al que emplea." *Joslin* v. *Idaho Times Publishing Co.,* (1935), 53 P. (2d) 323, 329, 56 Idaho 242.

"Cuando se celebra un contrato de trabajo que ha de ser realizado por otro, en el que el dueño (*contractee*) no se reserva la facultad de determinar los medios de hacerlo, sino simplemente exige el resultado del trabajo, el empleo es independiente y establece la relación de dueño (*contractee*) y contratista (*còntractor*) y no la de patrono y empleado." *Penn. R. R. Co.* v. *Allegheny County,* 188 A. 178, 179, 324 Pa. 216.

Es evidente, de acuerdo con los hechos probados, que Antonio Rivera era un contratista independiente con respecto a la West India Oil Co.

██ Se alega por el Administrador, sin embargo, que Juan N. Sotomayor no celebró ningún contrato con Antonio Rivera y además que dicho Sr. Sotomayor no estaba autorizado para celebrar esta clase de contratos a nombre de la compañía.

En cuanto a lo primero, una ligera lectura del récord nos convencerá que hubo evidencia tendente a demostrar la celebración del contrato, a la cual dió entero crédito la Comisión, y siendo ésa una conclusión de hecho, este tribunal no puede alterarla cuando existe en el récord evidencia que la sostiene. En lo que a la facultad de Juan N. Sotomayor para celebrar este contrato se refiere, la prueba demuestra que él era el representante de la compañía en un distrito que comprendía varios pueblos, entre ellos el de Morovis, y por limitadas que fueran sus facultades, fácil es comprender que cualquier persona con quien él contratase un trabajo para la compañía, cuyo valor fuese de $2 ó $3, tenía derecho a creer que estaba autorizado como tal representante de un distrito para celebrar tal contrato. En otras palabras, podía considerarse al Sr. Sotomayor un agente ostensible (*ostensible agent*).

No es exacto que el Administrador hubiese demostrado que Sotomayor no estaba autorizado para celebrar tal contrato. Por el contrario, nada aparece de la prueba a ese efecto. Tomamos de la declaración de Enrique Amado, Jefe del personal en la West India Oil Co.:

"P. ¿El señor Sotomayor?

"R. También lo conozco.

"P. ¿Qué es él?

"R. Agente del distrito de Manatí.

"P. ¿Agente de quién?

"R. De la West India Oil Co.

"P. ¿Usted sabe si Sotomayor puede emplear alguna persona para hacer algún trabajo para la West India?

"R. Actualmente no puede emplear a nadie sin tener autorización.

"P. ¿Pero allá para octubre de 1936?

"R. *En aquella fecha yo no era jefe del personal.*

"P. ¿Usted no era un jefe del personal entonces? ¿Desde cuándo es Ud. jefe del personal?

"R. Desde el 1937.

"P. ¿Desde el 1937, con posterioridad al accidente?

"R. Sí.

"P. Y en octubre de 1936, ¿qué era Ud., si ocupaba algún puesto?

*"R. Chief clerk."*

■ La Comisión Industrial hasta la fecha no ha determinado por reglamento, como prescribe el artículo 38 de la ley, lo que se entiende por "carácter accidental o casual", por lo que debemos recurrir a la jurisprudencia para determinar en cada caso particular si se trata del empleo incidental o casual a que se refiere la ley.

El trabajo que se realizó en este caso fué meramente incidental. No era de los trabajos que regularmente se realizan en el curso ordinario de los negocios de la compañía. Por consiguiente, no hay duda alguna de que el mismo era un trabajo incidental o casual. Véase a ese efecto la definición de las palabras *"casual employment"* en 6 W. & P. 289 *et seq.*

■ Pasemos ahora a la última de las cuestiones planteadas, a saber: ¿Podía considerarse el trabajo en este caso realizado por Antonio Rivera, como de los comprendidos dentro del negocio, industria u ocupación de la West India Oil Co.?

El autor de una extensa monografía sobre la materia en 58 A.L.R. 872, 882, refiriéndose al carácter del trabajo, dice:

"Si el trabajo que el contratista o subcontratista independiente emprende está dentro de las disposiciones legales que requieren que esté comprendido en el negocio o industria del principal, o una disposición semejante, es una cuestión que se suscita frecuentemente y sobre la cual no puede formularse una regla fija para resolver todos los casos aun en una misma jurisdicción."

En otras palabras, la cuestión ha de resolverse por los hechos de cada caso en particular. Siendo ello así, es natural que las autoridades estén en conflicto, hallándose jurisdicciones que sostienen que determinados hechos justifican la conclusión de que el trabajo está comprendido dentro del negocio o industria del patrono, mientras en otras, se interpretan hechos similares en sentido contrario. Por ejemplo, en la monografía anteriormente citada, que aparece en el tomo 58 A. L. R., nos encontramos con los siguientes casos: El de *Fox* v. *Fafnir Bearing Co.*, resuelto por la Corte Suprema de Connecticut en 1928 (139 A. 778), en el que un fabricante de cajas de bolas contrató con un obrero para que le lavase las ventanas de la fábrica, se sostuvo que el lavar las ventanas de la fábrica era una parte del proceso en el negocio u ocupación del principal. Sin embargo, en el caso de *American Radiator Co.* v. *Franzen*, resuelto por la Corte Suprema de Colorado en 1927 (254 P. 160), se decidió que un contrato para lavar las ventanas de una fábrica de radiadores (aparatos de calefacción) no estaba dentro del negocio o industria a que se dedicaba el dueño de la fábrica. Véanse además los casos citados en las monografías que aparecen en 58 A.L.R. 872, 882, y 105 A.L.R. 580, 588.

En el presente caso, si bien el negocio principal de la West India Oil Co. parece ser la venta de gasolina, sin embargo, para llevar a efecto ese negocio, hemos visto que tenía establecidas estaciones en distintos pueblos de la isla, bajo las condiciones anteriormente expresadas, entre las cuales se hallaba la de suministrar el equipo, manteniéndolo en buenas condiciones y en caso de no servir, suministrar otro nuevo. Consideradas todas las circunstancias con-

currentes en este caso, opinamos que los hechos probados justifican la conclusión de que reparar un artefacto de los por ella suministrados para llevar a efecto su negocio, está dentro de la industria o negocio a que la compañía se dedicaba.

*Por lo expuesto, procede desestimar el recurso y confirmar la resolución apelada.*

El Juez Asociado Sr. Wolf disintió.*