429 P.2d 852

Clinton GROPP, Plaintiff-Appellant,

v.

Charles E. PLUID and Charles T. Pluid, Individually, and partners, doing business as Pluid and Sons, Defendants-Respondents.

No. 9563.

Supreme Court of Idaho.

July 6, 1967.

Hardy C. Lyons, Sandpoint, for appellant.

W. W. Nixon, Bonners Ferry, E. L. Miller, Coeur d'Alene, for respondents.

SMITH, Justice.

Appellant (plaintiff) seeks recovery of damages for personal injuries allegedly caused by the negligence of Charles E. Pluid, one of the partners of respondent partnership, Pluid and Sons.

Appellant appeals from a judgment of involuntary dismissal of his action, based on the ruling that Charles E. Pluid was a "loaned employee" to appellant's employer, Pack River Timber Company, and that therefore, Pluid was appellant's fellow servant and not a third party as contemplated by I.C. § 72–204.

The principal issue raised by appellant's single assignment of error is whether the trial court erred in so ruling as a matter of

law; and in granting respondents' motion for directed verdict or in the alternative for involuntary dismissal made at the conclusion of appellant's evidence, and in entering the judgment of involuntary dismissal.

In August 1959 appellant was employed by Rocky Mountain Timber Co. (hereinafter sometimes referred to as Rocky Mountain), a sawmill operation in Bonner County, Idaho, which was operated by Pack River Lumber Company (hereinafter sometimes referred to as Pack River). Appellant's main job at the mill was that of operating a pettibone machine which he defined as "a four-wheel vehicle with hydraulic levers that extend out tracks, pick up logs and lumber." A main purpose of the machine was its use as a safety device in the unloading of truckloads of long logs delivered to the mill.

Appellant testified concerning the procedure of unloading the logs as follows:

"Q With respect to truck loading or a truck loaded with long logs, what was your procedure?

"A Well, put the Pettibone up against the top of the deck on a truckload of long logs * * *.

   *    *    *    *    *    *

"A To keep any logs from rolling down the wrong side of the load.

"Q Did you normally get off the machine?

"A Yes.

"Q For what purpose?

"A To undo the back chains while the driver undone the front ones.

"Q Did you always place the Pettibone against each truckload of logs that came into the Rocky Mountain Timber Co. yard?

"A No.

"Q When not, sir?

"A Lots of times the truck drivers would unload the logs before I had a chance, had a time to get a certain amount of loads out and they wouldn't wait in case I had these to be piled."

At the Rocky Mountain mill the pettibone operator, in this instance appellant Gropp, was also the "landing operator" who would tell the truck drivers, by designating the location, where the logs were to be dumped. Respondent Charles E. Pluid described the unloading process as follows:

"A * * * he [Gropp] would place the Pettibone against the load and then he would indicate for us to, or for me or for any other truck driver, * * * to go ahead and prepare your load to be dumped and that would be to trip your stake chains, removal of your wrappers and finally the tripping of your stakes.

\* \* \* \* \* \*

"Q In other words, he would put the Pettibone against the load and tell you when the machine was secure, isn't that correct?

"A And the load was secure to unload, yes.

"Q You would go ahead and trip the chains and the logs would fall off?

"A Most generally I tripped the chains, yes.

"Q So on the day in question [the day of the accident] you were not doing anything you don't normally do, you were simply tripping the chains?

"A Yes, sir."

Appellant essentially corroborated Pluid's aforesaid testimony.

Oscar Howland, a witness for appellant, was a pettibone operator for Pack River. He testified that when a load of logs "hit the yard" the operator "spotted" the load for unloading; that when the pettibone was placed against the load it was under the control of the pettibone operator, and that the truck driver then released the wrapping chains or binders of the load. He testified concerning the procedure:

"Q What do you tell him when he drives into the yard?

"A As a rule I either point to the place I want him to park his truck, which

is a place where we have been unloading logs, and he will drive to it and I get off the machine and tell him and then he will spot his truck wherever I ask him to.

"Q Then what do you do as a Pettibone operator?

"A Then I put my machine against the load and secure it to where I think it is secure to trip the chains and give him a nod to go ahead and unchain the truck.

\* \* \* \* \* \*

"Q What do you tell him how he is to perform this function?

"A Frankly, it is a nod of the head or a wave of the hand. He is watching me to see when I get the load secured and wave or nod at him and he goes ahead and unchains his load.

"Q Do you tell him how to do that?

"A No, I don't tell him how to take his chains off."

Appellant testified that on the day of the accident, August 13, 1959, the pettibone machine wasn't working properly; and consequently it could not be used for its usual safety function in unloading loads of logs. He then testified:

"A He [Pluid] came into the yard * * and I pointed down the alley which I wanted him to be in, * * * and I headed down to unload Mr. Pluid.

"Q By unload you mean what?

"A To take the Pettibone and help him unload.

"Q Is that the last that you recall?

"A Well, on the way down the alley my son came into the yard and I talked to him a minute and then proceeded on down to Mr. Pluid.

"Q You recall that?

"A I don't recall going on down to him. I had to, of course.

"Q The last thing you recall, definitely, is talking to your son?

"A Yes.

"Q * * * when did you wake up, so to speak?

"A In the hospital."

Respondent Charles E. Pluid testified concerning the events just prior to and including the accident:

"A When I arrived there on that day I drove in the yard, * * * and waited for directions to go wherever they wanted me to unload. This particular day Mr. Gropp was operating the Pettibone. After a few minutes he directed me down this road to where he wanted me to unload. Mr. Gropp then spotted me with my truck in the spot he wanted me to dump the logs. I think I got out of the truck after I had been spotted, Mr. Gropp was still sitting upon the Pettibone, and I waited for him to put the Pettibone against the load of logs * * *. He * * * never put the machine against the load of logs, he then got off the machine and I asked if he would put the Pettibone against the load and he said the hoist had not been working properly and we would unload this load of logs without the assistance of the Pettibone as he was afraid to use it on the load.

About that time there was a pickup truck that pulled up beside my load of logs, right close to it. Mr. Gropp told me to go ahead and to trip my stake chains and to take my wrappers off and he went over to this pickup and proceeded to talk to the person in the pickup. I took the stakes out, released the fid hook on the stake chains and took the wrapper off in front of the load and then walked to take the back wrapper off.

"Q * * * Mr. Pluid, actually the unhooking of the stake chains and wrapper chains is something you normally do when you go to unloading, you, as a truck driver, unhook the chains?

"A Normally, yes.

"Q Very well.

"A After I had released the front wrapper and went back to release the back wrapper, as I was releasing the back wrapper * * * Mr. Gropp was still talking to the person in the pickup truck. As I released the back wrapper, of course, I was watching the load of logs very closely because I knew without the Pettibone against it it was dangerous, and as I released the back wrapper and started to pull the wrapper off the load of logs, I observed the top log start to roll and I yelled, 'look out' * * * and as I jumped back Mr. Gropp was standing somewhere behind me, at that time I didn't know he was there, * * * but the log struck him * * *."

For a time prior to and on August 13, 1959, respondent partnership, consisting of Charles T. Pluid and his son, Charles E. Pluid, employed three employees, paid them for their services and covered them with workmen's compensation insurance. The partnership owned a truck and cut timber and hauled logs for Pack River under an oral contract. Pack River paid the father for the services performed by the partnership, which in turn made payments to the son.

Mr. Gill, Pack River's superintendent in charge of logging operations and mills, specified to the partnership the areas in which to cut the timber and from which to haul the logs; the amount or volume of logs to be delivered; the mill to haul the logs to; the cutting regulations to be followed, and when to haul logs to the mill. According to Charles E. Pluid, how the partnership got the logs to the mills was a matter of "internal management" of the partnership.

Either party could terminate the contractual relationship at any time, although the record is silent as to whether termination would carry a penalty.

The evidence is not in substantial dispute. It shows that respondent partner-

ship was an independent contractor of Pack River. The trial judge so recognized the relationship when, in explaining his ruling on respondents' motion for a directed verdict or involuntary dismissal, he stated: "I would not, in this case, rule that under their general relationship they were not independent contractors."

The trial judge entertained the view however, that at the actual time of the unloading in the instance at bar, Charles E. Pluid came under the control of Rocky Mountain [Pack River], and that the general test of "the right to control the employee or power to control the work to be performed," gave rise to the relationship of employer and employee thus to constitute Pluid a "loaned employee" of Pack River.

The evidence shows that the unloading of truckloads of logs, delivered at the Rocky Mountain mill, was under the control of Pack River. A pettibone machine, or one of similar import, was required to be used in the unloading under the provisions of Section 14.4 [1] of Idaho's Minimum Safety Standards and Practices for Logging, Sawmilling, Woodworking and Allied Industries, promulgated by the Industrial Accident Board, and to which the evidence referred. That duty Pack River observed through its pettibone operators, one of whom was appellant who was aware of those safety regulations. The evidence also shows that when the pettibone was used in unloading, the unfastening of the binder or wrapper chains was a detail which the truck driver ordinarily performed in whole or in part, and that he was not told how to perform the same. See Brumfield v. Truck Insurance Exchange, 333 F.2d 699 (9th Cir. 1964).

■ In the case at bar however we are not called upon to decide whether, during the ordinary unloading operations the driver of a truckload of logs would become a loaned employee of Pack River. Rather we have the unusual situation here, where a pettibone—such a machine being manditorily required to be used when unloading logs—operated by appellant, had become disabled in that its hoisting mechanism was not in proper working order, a fact of which appellant had knowledge; also appellant's specific instructions to respondent Charles E. Pluid that "we would unload this load of logs without the assistance of the pettibone as he [Gropp] was afraid to use it on the load," whereupon appellant then engaged in other activities; also the shifting of Pack River's responsibility of unloading a load of logs over which it exercised control, to respondent Pluid when it directed Pluid to perform Pack River's duty of unloading, without the use of a pettibone machine. It was while Pluid was performing such unusual delegated duty as so directed, that a log slipped from the load and injured appellant. It follows that respondents Pluid, individually and doing business as the partnership of Pluid and Sons, are not third parties against whom appellant can maintain a tort action for damages under I.C. § 72–204.

Appellant cites and relies upon Nissula v. Southern Idaho Timber Protective Ass'n, 73 Idaho 37, 245 P.2d 400 (1952). In that case the defendant association rented a tractor with an operator from the plaintiff for use in fighting a forest fire. In those operations the tractor was damaged, which plaintiff charged to the negligence of defendant. The defendant alleged that the damage was caused by the negligence of the operator who remained the servant of the owner. This court held that where the operator was selected by the owner who retained the right to discharge the operator and substitute another, the operator, in the manipulation and operation of the tractor, remained the servant of the owner even though subject to the control of the defendant association as to where the

---

1. 14.4 Truck lifts, cranes of A frames, (power operated recommended) or their equivalent, must be used when unloading logs. Such devices must be securely attached, tightened or fixed, or other positive safeguards be securely in place before the bind chains, wrappers, or stakes are released.

operator should go and what work he was to perform. A non-suit granted by the trial court, was reversed and the cause remanded for new trial on the issue as to whose negligence caused the injury.

The Nissula case is not in point with the case at bar, because here respondent Charles E. Pluid need not have been used in the unusual unloading operation of August 13, 1959. Pack River, at its will, could have substituted another in place of Pluid to perform that unloading operation; rather it delegated its own task of unloading to Pluid.

■ We are also cognizant of the rule as urged by appellant that the fact that work is to be done under directions and to the satisfaction of certain persons representing the principal, do not necessarily render the person contracted with to do the work, a servant. Citing Merrill v. Duffy Reed Construction Co., 82 Idaho 410, 353 P.2d 657 (1960); Ohm v. J. R. Simplot Co., 70 Idaho 318, 216 P.2d 952 (1950); Laub v. Meyer, Inc., 70 Idaho 224, 214 P.2d 884 (1950); In Re General Electric Co., 66 Idaho 91, 156 P.2d 190 (1945); and Joslin v. Idaho Times Pub. Co., 56 Idaho 242, 53 P.2d 323 (1935).

Cloughley v. Orange Transportation Co., 80 Idaho 226, 327 P.2d 369 (1958) and the rules announced therein however, are decisive in the case at bar. In that case, the transportation company, by use of its truck, driven by one Park, delivered two boilers to Detweiler, Inc., a contractor for the performance of certain construction work for its principal. Plaintiff Cloughley was an employee of Detweiler, Inc. Pearcy was mechanical superintendent of Detweiler, Inc.

Under rules and regulations approved by the Interstate Commerce Commission, the loading or unloading of any bulky object exceeding certain dimensions, or 500 pounds in weight, "shall be performed by the shipper or consignee, as the case may be." The evidence showed that Mr. Pearcy (Detweiler, Inc.) gave specific instructions to Mr. Park relating to the unloading of the boilers. In performing such duties as so directed, Park drove the truck in an alleged negligent manner against a crane causing its boom to collapse, which incident was causative of plaintiff Cloughley's injury.

The court held that from the evidence it was the duty of Detweiler, Inc., the consignee, to unload the boilers and that Detweiler, Inc. recognized that duty and actually took charge of and performed the unloading operations, from which it followed that Park, in operating the Orange Tranportation truck during the attempted unloading, as directed by Mr. Pearcy of Detweiler, Inc., became the temporary loaned employee of Detweiler, Inc.; that therefore, the exclusive remedy of plaintiff Cloughley, a fellow employee, was under the workmen's compensation law.

The court further ruled that the regulations imposed or approved by the Interstate Commerce Commission were binding upon the carrier and the consignee, so that where the duty developed upon the consignee to unload, the carrier and the consignee could not lawfully contract to impose that duty upon the carrier.

■ The general test of the employer-employee relationship is well stated in Pinson v. Minidoka Highway Dist., 61 Idaho 731, 106 P.2d 1020 (1940) as follows:

"* * * there is a well-established rule to the effect that the question of the identity of the person who pays compensation is not controlling, and is not a circumstance which is decisive or determinative of the question whether a person to whom an employee is lent becomes his employer. [Citations] The general test is the right to control and direct the activities of the employee, or the power to control the details of the work to be performed and to determine how it shall be done, and whether it shall stop or continue, that gives rise to the relationship of employer and employee, and where the employee comes under the direction and control of the person to whom his services have been furnished,

the latter becomes his temporary employer, and liable for compensation. [Citations]" 61 Idaho 737, 106 P.2d 1022.

In the Pinson case this court quoted with approval from Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909), as follows:

"It sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in ·his employ who can do it nor is willing·;to take such persons into his general service. He may then enter into an agreement with another. If the other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished. * * * To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,— a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work." 61 Idaho 736, 106 P.2d 1022.

In Lewis v. Potter (Mont.) 427 P.2d 306, 309 (1967), the Supreme Court of Montana quoted with approval from Oklahoma Ordnance Works Authority v. Garrison, Okl., 424 P.2d 983, 985 (1967) wherein it was noted that the usual loaned servant case arises " * * * where it is not the usual business of the original master to loan or hire out such servant and the business of such master is not directly furthered thereby, the borrowing master alone benefiting from the servant's labor and the original master making no profit from the borrowing of his servant." 427 P.2d 309. See also Laub v. Meyer, Inc., supra; Ohm v. J. R. Simplot Co., supra; Brown v. Arrington Const. Co., 74 Idaho 338, 262 P.2d 789 (1953). Restatement (1 Restatement 2nd) Agency §§ 220, 224.

The evidence showing as it does, that Pack River exercised control over the loads of logs entering the mill premises, and that it was charged with and ordinarily performed the unloading· operations with the use of a safety device as required by the safety regulations, it follows that on August 13, 1959, Charles E. Pluid, during the attempted unloading of the truckload of logs without the use of a pettibone or similar machine, as instructed by Pack River through appellant, was the temporary loaned employee of Pack River. It follows that Pack River having retained the right to control the manner and methods of unloading; also the right to control Pluid during the actual unloading operation under the unusual situation shown, and Pluid becoming for the nonce the loaned servant and appellant's fellow employee, both under the same master, viz., Pack River Timber Company, it follows that appellant's exclusive remedy is under the workmen's compensation law, and that the trial court correctly entered the judgment of involuntary dismissal.

The judgment is affirmed. Costs to respondents.

McQUADE, McFADDEN and SPEAR, JJ., and DONALDSON, D. J., concur.