(No. 6902.   April 29, 1942)

IDAHO TIMES PUBLISHING COMPANY and TWIN FALLS PUBLISHING COMPANY, Appellants, v. INDUSTRIAL ACCIDENT BOARD OF THE STATE OF IDAHO, Respondent.

(126 Pac. (2d) 573)

Rehearing denied June 22, 1942

Chapman & Chapman and James T. Murphy, for
Appellants.

Bert H. Miller, Attorney General, Thos. M. Robertson, Jr., and Paul B. Ennis, Assistant Attorneys General, for Respondent.

HOLDEN, J.—For many years the Twin Falls News, a morning newspaper, and the Idaho Evening Times, have been (and still are) published at Twin Falls, Idaho. Since 1935 these newspapers had the same control and management, the same circulation manager and identical agreements with their respective motor vehicle carriers. The agreement with these carriers follows:

"THIS AGREEMENT, Made this ............ day of ............................, 19........, between ...................................................., and Idaho Corporation, party of the first part, and.............................................................. of ...................................................., Idaho, party of the second part, WITNESSETH:

That for and in consideration of the mutual promises herein contained, the parties hereto agree as follows:

(1) The said party of the second part agrees to deliver and distribute the newspaper published by the party of the first part on each day of the week except Sunday, from the building occupied by the ............................................., at ............................................. in the City of ............................................., County of ............................................., State of Idaho, to such persons and at such places and along such route or routes, and on such regular schedule or schedules as may be from time to time designated and furnished to him by the said party of the first part, the time of and the routes and schedules for said delivery and distribution, and the strict adherence thereto being the essence of this contract.

In the event contingencies render it apparently impossible for said party of the second part to conform to said regular schedules or routes, he agrees to promptly notify the party of the first part by telephoning its mailing room, stating the facts and reasons therefor.

(2) The said party of the first part agrees to pay to said party of the second part therefor the sum of ...................... cents per mile for each and every mile traveled by him from the building occupied by the said party of the first part and return to ............................, over the most direct route, for the delivery and distribution of said papers under the terms hereof; that in the event said party of the second part shall deliver in excess of an average of ................. newspapers per mile, computed on the miles traveled from the building occupied by the party of the first part to the last delivery upon the route so designated, that the said party of the second part shall receive in addition thereto the sum of ................. cents for each delivery made on said route over and above the said average delivery per mile; less the following sums as stipulated damages for defaults and failure on the part of the party of the second part;

for each delay or lateness of from............ to ............ minutes, ............ CENTS, and from ............ to ............ minutes, ............ cents; for each time the party of the first part for any reason hires or procures another vehicle to replace or relieve vehicle of the party of the second part, $................ to $................, this being dependent upon the price said party of the first part has to pay third party for the services, to be paid weekly.

(3) The said party of the second part shall make such delivery and distribution according to his own means and methods of conveyance, which shall belong to and be in the exclusive charge and control of the party of the second part and which shall not be subject to control or supervision of said party of the first part, excepting as to the results of said work, and it is hereby expressly understood that the party of the first part does not hereby hire or rent the use of the same, or assume any liability for the use or method of use thereof.

(4) This agreement may be terminated by either party at any time without notice.

(5) The terms of this agreement shall not be changed, modified, altered or supplemented excepting in writing signed by the parties hereto."

June 26th, 1939, the attorney for the Industrial Accident Board rendered an opinion termed "Administrative Ruling No. 109" which the Board held in obeyance until November 14, 1940, at which time it issued "Administrative Ruling No. 185," by which the Board held these newspapers were engaged in "Covered Employment."

Thereafter these newspapers filed a joint petition with the Board seeking a review of the above mentioned rulings. January 7th, 1941, the petition was heard by the Board. At the hearing, Al Westergren, circulation manager of both newspapers (the only witness called) testified on direct examination:

"Q. Do you know, Mr. Westergren, whether or not your motor carriers perform other services than other— than under the contracts exhibits 'C' and 'D'?

A. I do.

Q. And for other persons?

A. For other persons.

Q. What is the situation in that respect?

A. They carry parcels, the majority of them, parcels for various——

MR. SUPPIGER: Are you testifying from your own knowledge or information?

A. From my own knowledge.

MR. SUPPIGER: All right.

Q. I believe you have already testified that the motor vehicle carriers and the distribution of the papers is directly under your control?

A. Yes.

Q. Will you proceed?

A. They do carry parcels for parts companies, from their stores to various automobile shops in these towns where they enter.

Q. Who pays them for that?

A. The parts companies or whoever they carry the parcels for.

Q. Do they perform services for other persons in addition to their route?

A. I know of two of them that—Mr. Norton works for the Cloystein's Cyclery as a mechanic and Mr. Tiner has a business of his own in the refrigeration field, repairing refrigerators. He is taking some course through the mail and is now working at that. Mr. Styles has worked at the Sav-Mor Drug Store until just recently. That is all I know of at the moment.

Q. Do you know whether or not any have operated school busses?

A. Yes. Mr. Tiner operated a school bus.

Q. Does either of the two companies by whom you are employed as circulation manager furnish the vehicles or conveyances used by the motor vehicle carriers for your publications?

A. They do not.

Q. Do you as circulation manager direct or in any manner supervise the manner in which the motor vehicle carriers perform their contract or agreement?

A. No.

Q. Do you specify, as circulation manager of these two companies, what method must be used by the carriers in the performance of their agreement?

A. No. I do not.

Q. In the event that the carriers working under contracts similar to exhibits 'C' and 'D' is unable to travel

his route on any given date, who provides his substitute or assistant?

A. He has to furnish his own assistant.

Q. And that is no concern to the company?

A. No.

Q. Do these carriers have any duties with the two companies mentioned other than the performance of the contracts exhibits 'C' and 'D'?

A. No. None.

Q. And their duties and the performance of their contract is limited entirely to the matters set forth in the agreements?

A. That is correct."

On cross-examination Mr. Westergren testified:

"Q. Another question I would like to ask is have any of the route carriers to your knowledge operated a delivery route over approximately the same territory prior to their entering into a contract for the delivery of the publications of the two papers you represent?

MR. CHAPMAN: You mean——

Q. For the general public?

A. The only one I could recall would be Mr. Styles. I believe he handled the Rapid Express from Twin Falls to Buhl.

Q. That is substantially the same route he delivers the papers for your company?

A. No. It isn't.

\*    \*    \*    \*    \*    \*    \*    \*    \*

Q. I believe you mentioned that one of the men was employed in a drug store part of the time?

A. Yes.

Q. That was not in the capacity of a delivery man?

A. No. He was a clerk.

Q. Did you say one worked in a parts house?

A. No. I said he delivered parcels for a parts house.

Q. The one that works in the drug store as a clerk has no other activity other than as route carrier and clerk in the drug store?

A. As a matter of fact during the time he was clerking he had his brother-in-law delivering the route for him."

January 23rd, 1941, the Board found:

"That under the terms of the contracts existing between the petitioners and the various 'route carriers' the 'route carriers' are free from control as to the method and manner of delivering the newspapers but that it has not been shown to the satisfaction of the Board that the said 'route carriers' are 'customarily engaged in an independently established trade, profession or business' and that their service is not excepted from 'covered employment' as defined in Section 18-3 of the Unemployment Compensation Law."

On the same day the Board entered the following order:

"WHEREFORE, IT IS ORDERED AND THIS DOES ORDER That the petitioners, Twin Falls News Publishing Company and the Idaho Times Publishing Company, and each of them, report to the Unemployment Compensation Division of the Industrial Accident Board and pay contributions on all earnings of all 'route carriers' who are operating under contracts like those under which Wayne Cox and Claude Norton operated except on those of such who are first shown to the satisfaction of the Industrial Accident Board to have been and will continue to be free from direction and control over the performance of their services, both in law and in fact; and are customarily engaged in an independently established trade, profession or business."

The appeal to this court is from that order.

Section 19, Chap. 187 (1937 S. L. p. 317) provided:

"[5] Services performed by an individual for wages shall be deemed to be employment subject to this Act unless and until it is shown to the satisfaction of the Board that—

(A) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

(B) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

(C) such individual is customarily engaged in an independently established trade, occupation, profession or business."

Sections 18-1, 18-2, 18-3 and 18-5 of Chap. 239 (1939 S. L. pages 575, 576, 577) provided:

"[18-1]  EMPLOYMENT.

"The term 'employment' * * * where used in this Act shall, for the purpose of·this Act, mean service, including service in interstate commerce, performed by one or more individuals for wages or under any contract of hire, written or oral, express or implied.

[18-2]  WAGES.

"The term 'wages' where used in this Act shall, for the purpose of this Act, mean all remuneration payable for personal services including commissions and bonuses and the cash value of all remuneration payable in any medium other than * money. The reasonable cash value of remuneration payable in any medium other than * money shall be estimated and determined * * * as the Board shall, by regulations, prescribe. * *

[18-3]  COVERED EMPLOYMENT.

"The term 'Covered Employment' where used in this Act shall, for the purpose of this act, mean an individual's entire service including service in interstate commerce, but excluding service excepted by section 18-5 of this Act, performed by him for wages or under any contract of hire, written or oral, express or implied, within or both within and without this State, in the course of the trade, profession or business of a covered employer, as defined in Section 7-5 of this Act. . . . . "

[18-5]  EXCEPTED EMPLOYMENT.

    (a)  . . . . . .
    (b)  . . . . . .
    (c)  . . . . . .
    (d)  . . . . . .
    (e)  Service performed by an individual if it is first shown to the satisfaction of the Board that—

        (1)  He * * * has been and will continue to be free from direction or control over the performance of his services both * * * in law and in fact; and

(2)  He * * * is customarily engaged in an independently established trade, profession or business.

(f)  . . . . . .

It will be noted the contract expressly provided that:

"The said party of the second part (carrier) shall make such delivery and distribution according to his own means and methods of conveyance, which shall belong to and be in the exclusive charge and control of said party of the second part, and shall not be subject to control or supervision of said party of the first part, excepting as to the results of said work, and it is hereby expressly understood that the party of the first part (newspaper) does not hereby hire or rent the use of the same, or assume any liability for the use or method and use thereof."

And it will be further noted the Board found under the terms of the carrier contracts, the carriers were "free from control," "but that it has not been shown to the satisfaction of the Board that the said 'route carriers' are 'customarily engaged in an independently established trade, profession or business.'" The finding of the Board to the effect it had not been satisfactorily shown the route carriers were engaged in "an independently established trade, profession or business" is contrary to the uncontradicted evidence. To illustrate: The only witness called at the hearing—circulation manager Westergren—testified that carrier Styles "handled the Rapid Express from Twin Falls to Buhl"; that carrier Norton "works for the Gloystein's Cyclery as a mechanic" and that carrier Tiner had a "business of his own in the refrigeration field, repairing refrigerators." Where, as here, the evidence shows without contradiction, carriers are actually and customarily engaged in an independently established trade or business, the Board cannot arbitrarily or capriciously find the contrary. This court held in *Pierstorff v. Gray's Auto Shop*, 58 Ida. 438, 447, 74 Pac. (2d) 171, that

"The rule applicable to all witnesses, whether parties or interested in the event of an action, is, that either a board, court, or jury must accept as true the positive uncontradicted testimony of a credible witness, unless his testimony is inherently improbable, or rendered so by

facts and circumstances disclosed at the hearing or trial. (Citing cases) . . . . neither the trial court nor a jury may arbitrarily or capriciously disregard the testimony of a witness unimpeached by any of the modes known to the law, if such testimony does not exceed probability."

Furthermore, and as shown by the record, the carriers were not engaged in the business of publishing newspapers. They were engaged in an independent business— the transportation business—carrying newspapers from one town to another, the shortest distance being about thirty miles, and the longest about a hundred miles, compensation therefor being paid on a mileage basis. In addition to the transportation of newspapers, parcels for others than the publishers were also transported.

It follows from what has been said, the order of the Board must be reversed, and the cause remanded, and it is so ordered, with directions to the Board to enter an order in harmony with the views herein expressed. Costs awarded appellants.

Budge, Ailshie, JJ., concur.

GIVENS, C.J., dissenting—Section 19, chapter 187, 1937 Session Laws, page 317, subsection 5(a) requires that the individual to be an independent contractor must be free from control or direction over the performance of his services "both under his contract of service and *in fact*." (emphasis mine.) The board made the following rule of law:

"That the earnings of all 'route carriers' for the petitioners, Twin Falls News Publishing Company and the Idaho Times Publishing Company, and each of them, who are operating under contracts like those under which Wayne Cox and Claude Norton operated and which are set forth in the foregoing Findings of Fact, must be reported to the Unemployment Compensation Division of the Industrial Accident Board by said petitioners and contributions thereon must be made by said petitioners on all 'route carriers' except on those of such who are first shown to the satisfaction of the Board to have been and will continue to be free from direction or control over the performance of their services, both in law and in fact; and are customarily engaged in an independently established

trade, profession or business; and that an order to that effect should be given, made, filed and entered herein," evidently indicating that the board was not satisfied that the employer had shown that the carriers were free from control both under the contract and in fact. Nevertheless, the board refused to permit appellants to show whether or not there was control in fact:

"Q. I will ask you further, Mr. Westergren, whether or not yourself or either of the two companies, the petitioners here, exercise any control or direction over the performance of the services performed by the motor carriers?

"MR. SUPPIGER: Is that competent and proper, Mr. Chapman? Isn't the question as to whether they have any right to exercise. Is that not the question?

"MR. CHAPMAN: The way we view the situation as to the inquiry made, the contract, of course as to that, speaks for itself but I think we have a right to show under this contract they did not exercise any control in fact.

"MR. SUPPIGER: It is the consensus of the board that the question is not a proper one. The inquiry is as to their right under the contract which you have introduced and which we understand is the controlling instrument."

The case should be reversed and remanded for the purpose of having the board hear such evidence as the appellants desire to offer as to whether or not there was control in fact. (*Paul Dehlin v. Sid Shuck*, syl. 1, 124 P 2 244 63 Ida. 620; *Feuling v. Farmers' Co-operative Ditch Co.*, 54 Ida. 326, 31 Pac. (2d) 683; *Nistad v. Winston Lumber Co.*, 59 Ida. 533, 85 Pac. (2d) 236.)

MORGAN, J., dissenting—Two contracts were introduced in evidence, one between Idaho Times Publishing Company and Wayne Cox and the other between Twin Falls News Publishing Company and Claude Norton. These contracts were written on forms like that contained in the majority opinion.

Appellants contend these contracts constitute the route carriers independent contractors under the common law, and that the common law with respect to master and servant and independent contractors is not changed, or

abrogated, by the Unemployment Compensation Law. Respondent contends the statutory definition of "employment" in the Unemployment Compensation Law is broader than the common law definition of that word and that, in cases of conflict between the common law and a statute, the latter should prevail. This difference of opinion, of the parties litigant, constitutes the question of law presented to us for decision.

Idaho 1937 Session Laws, chapt. 187, p. 317, provided:

"(5)    Services performed by an individual for wages shall be deemed to be employment subject to this Act unless and until it is shown to the satisfaction of the Board that—

"(A)    such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(B)    such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(C)    such individual is customarily engaged in an independently established trade, occupation, profession, or business."

At the time this proceeding was commenced Idaho Sess. L., 1939, chapt. 239 was in force. It contained the following provisions (pages 575, 576, 577) :

"Sec. 18-1    EMPLOYMENT.

"The term 'employment' where used in this Act shall, for the purpose of this Act, mean service, including service in interstate commerce, performed by one or more individuals for wages or under any contract of hire, written or oral, express or emplied."

"Sec. 18-2.    WAGES.

"The term 'wages' where used in this Act shall, for the purpose of this Act, mean all remuneration payable for personal services, including commissions and bonuses and the cash value of all remuneration payable in any medium other than money. The reasonable cash value of remuneration payable in any medium other than money

shall be estimated and determined as the Board shall, by regulations, prescribe."

"Sec. 18-3. COVERED EMPLOYMENT.

"The term 'covered employment' where used in this Act shall, for the purpose of this Act, mean an individual's entire service, including service in interstate commerce, but excluding service excepted by section 18-5 of this Act, performed by him for wages or under any contract of hire, written or oral, express or implied, within or both within and without this State, in the course of the trade, profession or business of a covered employer, as defined in section 7-5 of this Act, . . . . "

"Sec. 18-5. EXCEPTED EMPLOYMENT.

"The term 'covered employment' shall not include—
" * * *

"(e) Service performed by an individual if it is first shown to the satisfaction of the Board that—

"(1) He has been and will continue to be free from direction or control over the performance of his services, both in law and in fact; and

"(2) He is customarily engaged in an independently established trade, profession or business; * * * "

The 1941 session of the legislature again amended the Unemployment Compensation Law (1941 Sess. L., chapt. 182, pp. 389, 393), but it did not become effective until after the making of the order appealed from, and has no application to it. This case is governed by the 1939 enactment.

During the brief time which had elapsed since the enactment of unemployment compensation laws throughout the United States, much litigation has resulted from difference of opinion as to whether one performing service for another did so as an employee or as an independent contractor. In deciding that litigation, some courts have held unemployment compensation laws, comparable to ours, to be nothing more than restatements of the common law defining "employment" and "independent contractor." Among the cases tending to support this theory are: *Gall v. Detroit Journal Co.*, 191 Mich. 405, 158 N. W. 36, 19 A. L. R. 1164; *Hill Hotel Co. v. Kinney*, 138 Neb.

760, 295 N. W. 397; *Wisconsin B. & I. Co. v. Industrial Comm.*, 233 Wis. 467, 290 N. W. 199; *Washington Recorder Pub. Co. v. Ernst*, 199 Wash. 176, 91 Pac. (2d) 718.

Among the cases tending to sustain the contention that unemployment compensation laws, like ours, are broader in scope than the common law defining "employment" and "independent contractor" are: *Schomp v. Fuller Brush Co.*, 124 N. J. L. 487, 12 A. 2d 702, 126 N. J. L. 368, 19 A. 2d 780; *Industrial Com. v. Northwestern Co.*, 103 Colo. 550, 88 Pac. (2d) 560; *Singer Sewing Mach. Co. v. State U. Comp. Commissoin*, (Ore.) 103 Pac. (2d) 708, 116 Pac. (2d) 744; *Creameries of America, Inc. v. Ind. Comm. et al.*, 98 Ut. 571, 102 Pac. (2d) 300; *Salt Lake Tribune Pub. Co. v. Industrial Comm. et al.*, 99 Ut. 259, 102 Pac. (2d) 307; *Globe Grain & Milling Co. v. Ind. Comm. et al.*, 98 Ut. 36, 91 Pac. (2d) 512; *McDermott v. State*, 196 Wash. 261, 82 Pac. (2d) 568; *Mulhausen v. Bates*, (Wash.) 114 Pac. (2d) 995; *In Re Foy*, (Wash.) 116 Pac. (2d) 545.

Appellants quote from *Wisconsin B. & I. Co. v. Industrial Comm.*, 233 Wis. 467, 474, 290 N. W. 199, 202, in part, as follows:

" 'It must of course be determined whether Drews was an independent subcontractor or an employee, because it is only through his status as an employee being determined that the claimants can be held to have been employees of the company. To render the claimants employees of the company Drews must have been an employee of the company in the sense that he was hiring the claimants for and in behalf of the company as its agent. But that status is not to be determined from the language of the Unemployment Compensation Act. It must be determined as such status is determined at common law or under the Workmen's Compensation Act. The status is determined by the same consideration under the Workmen's Compensation Act as under the common law. Statutes are not to be construed as changing the common law unless the purpose to effect such change is clearly expressed therein. To have such effect "the language [of the statute] must be clear, unambiguous, and peremptory." *Meek v. Pierce*, 19 Wis. \*300, \*303. That rule has been

consistently adhered to ever since it was so stated in the case cited. * * * ' "

In 1881, the Idaho Territorial Legislature adopted a code of civil procedure, section 3 of which was:

"The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this Code. The Code establishes the law of this Territory, respecting the subjects to which it relates, and its provisions and all proceedings under it, are to be liberally construed, with a view to effect its objects and to promote justice."

That section appears in every codification of the laws of the Territory and State of Idaho and is to be found in our latest codification, Idaho Code Annotated, 1932, § 70-102. That rule of statutory construction has been consistently followed by this court throughout the judicial history of the territory and state, as will be seen by reference to the annotations following the last mentioned section. When a conflict occurs between the common law and a statute we, here in Idaho, are governed by the statute.

A study of Idaho legislation relating to unemployment compensation leaves no doubt that the legislature did not intend its application to be confined to those who occupy the position of master and servant. It is clear the legislature intended that, in order to deprive one who has performed services for another of the benefits of the law, it must not only be shown to the satisfaction of the board that "he has been and will continue to be free from direction or control over the performance of his services, both in law and in fact," but it must also be shown, to the satisfaction of the board, that "he is customarily engaged in an independently established trade, profession or business." Our statute will not bear the construction that freedom from direction and control, alone, will defeat the right of one performing service for another to unemployment compensation, or exempt the one for whom the service is performed from making the statutory contribution to the unemployment compensation fund.

The Supreme Court of Colorado, in *Industrial Com. v. Northwestern Co.*, 103 Colo. 550, 555, 556, 557, 88 Pac.

(2d) 560, 563, 564, stated the law on this subject, as I understand it to be, as follows:

"Referring to the company's contention that the persons involved herein are independent contractors and therefore exempt from the operation of the act, and considering solely the legislative intent as it appears from the act itself, what do we find? When defining or referring to 'wages,' 'employment,' 'employer' and 'benefits' in the act the legislature deliberately avoids the use of the word 'employee,' and uses the much broader term, "individual.' That this indicates legislative intent as to who is covered, cannot be doubted. The terms 'independent contractor' or 'master and servant' nowhere appear. The act prescribes the statutory test, section 19 (g) (5), supra, and we must not be led astray by any other criterion. If we are controlled by the legislative intent, and we are, this is the only approach we can adopt in the determination of this problem. In this we are supported by our own decisions and those of other courts of last resort.

" * * *

"That the legislature has the power to define terms used by it and that statutory definitions control judicial interpretation cannot be doubted. *Fox v. Standard Oil Co.,* 294 U. S. 87, 55 Sup. Ct. 333, 79 L. Ed. 780; *Steinberg v. United States,* 14 Fed. (2d) 564, 566. Here the statutory definition of 'employment' is broad and inclusive, and it cannot be so construed as to limit the meaning to the relationship of master and servant without violating the legislative intent.

" * * *

"The third test as to exemption from coverage is that the 'individual' is customarily engaged independently in an established trade, occupation, profession or business. This would necessitate a showing by the company to the satisfaction of the commission that its agents are established in the business of selling insurance, independent of whatever connection they may have with the company. It may also have some bearing on those who work only part time in soliciting insurance and are customarily engaged in some other profession, business or occupation. We, however, emphasize that an individual who seeks ex-

emption must satisfy the commission that the services which are performed by others meet the requirements of all three tests, and that a failure to conform to any one of them is sufficient to create statutory 'employment,' and such an 'individual' is covered under the act."

The law requires, in order that appellants be exempted from contributing to the Unemployment Compensation Fund, not only that they show the route carriers had been, and would continue to be, free from direction or control over the performance of their services, both in law and in fact, but that they were customarily engaged in independently established trades, professions or businesses.

The burden was on appellants to prove facts which would bring them within the statutory exemption from liability, to make contributions to the Unemployment Compensation Fund, based on the earnings of their carriers. One of the requirements, in order that they be exempted, is that their carriers were customarily engaged in independently established trades, professions or businesses, during the time for which exemption is claimed. On this point, there is failure of proof, as appears from the testimony of appellants' witness, Westergren, the only one to testify, copied in the majority opinion. The evidence does not show the extent to which appellant's carriers were employed by others. So far as is shown the activities of the carriers, aside from the work they were doing for appellants, may have been occasional and negligible, and did not amount to an independently established trade, profession or business. It is not shown the carriers were employed by anyone, other than appellants, at any time after the enactment of the Unemployment Compensation Law. There is no evidence on which the board can base an order exempting appellants, or either of them, from payment of contributions on the earnings of their carriers.

The fourth paragraph of the findings of fact is:

"That under the terms of the contracts existing between the petitioners and the various 'route carriers' the 'route carriers' are free from control as to the method and manner of delivering the newspapers but that it has not

been shown to the satisfaction of the board that the said 'route carriers' are 'customarily engaged in an independently established trade, profession or business' and that their service is not excepted from 'covered employment' as defined in Section 18-3 of the Unemployment Compensation Law."

That finding of fact is favorable to appellants as to one requirement of the law, and unfavorable to them with respect to the other.

The order of the board, copied in the majority opinion, requires appellants to prove, in order to enjoy the benefits of exemption, that the carriers "have been and will continue to be free from direction and control over the performance of their services, both in law and in fact; and are customarily engaged in an independently established trade, profession or business."

The order conforms to the requirements of the law, and the facts established will not justify any other.

Chief Justice Givens finds fault with a ruling, by the board, excluding certain evidence. The ruling has not been assigned as error. Assuming, but not deciding, it was erroneous, the error is harmless because the board found the fact sought to be established, favorably to appellants, who were seeking to establish it.