(No. 7171.   February 7, 1945.)

In re liability of GENERAL ELECTRIC COMPANY, a corporation, for unemployment compensation excise tax.

[156 Pac. (2d) 190.]
Rehearing denied March 12, 1945.

Hawley & Hawley and Claude V. Marcus for appellant.

Bert H. Miller, Attorney General, and Thos. Y. Gwilliam, Assistant Attorney General, for respondent.

HOLDEN, J.—It appears prior to the making of the contract in question here Thomas H. Mellen and Eusebio Aguirre had been engaged, at least to some extent, in the business of contracting "cross-cutting, drifting" and also that "Aguirre and another man" had had a contract for driving a tunnel at the Yuba mine. It further appears shortly prior to May 25, 1942, a Mr. Richards of the Du Pont Company, told Mellen, in effect, the General Electric Company contemplated the development of a mine it owned near Patterson, in Lemhi County, and to that end letting a contract for driving about 1,000 feet of tunnel. Thereupon a group composed of Mellen, Aguirre, McCoy and Gissell went to Patterson and looked the property over and while there discussed and "threshed out" with a representative of the company, the terms of a contract for driving the tunnel. On the 25th day of May, 1942, as a result of the trip of Mellen, Gissell, McCoy and Aguirre over to the mine and the discussion of the terms of the contract with a representative of the company, a contract was entered into between the company and that group whereby the group contracted "to drive drifts and/or crosscuts in the direction stipulated between the company or its authorized representatives." The contract also required that the work of development start on or before June 1, 1942 and that it be completed on or before September 30, 1942. The company contracted to pay $8.00 per foot for a minimum footage of 1,000 feet and in addition thereto the sum of $10.00 for each set of timbers installed in driving the drifts or tunnels covered by the contract. Under the terms of the contract all tunneling was to be, and was, paid for

by the foot, and not by either the hour or day. In the matter of driving the tunnel the company contracted to furnish the contractors "with compressed air for the purpose of operating air drills, drill sharpener and ore loader." It further contracted "to furnish all materials and machinery, excepting only rubber apparel, explosives and repair and renewal parts for all equipment using compressed air in the mine, which shall be necessary for the performance of the work of mining or drifting." "Said materials and machinery shall include, but not be limited to, all carbide, air drills, drill steel, drill columns, jumbo, air hose, mine rails, spikes and ties, splice bars, framed timber, wedges, ore loader, mine cars" "together with such necessary tools, air, water and ventilator pipe and fittings as shall be necessary for proper mining operations." Under the terms of the contract the company also agreed the contractors and their families might have the use of certain log cabins standing on the property.

The contractors contracted:

"To perform all work in a good and miner-like manner at all times and to the satisfaction of the owner, or its authorized representatives; to excavate the drifts or crosscuts at least five feet in width and seven feet in height in the clear, and construct on the floor of said tunnel an eight inch water ditch with a one per cent grade.

"To erect and install framed timber sets to be furnished by the owner; to install air, water and ventilator pipe and fittings, mine tracks and switches in a good and workmanlike manner to the satisfaction of the owner, or its authorized representative, and to maintain the same, and to maintain the tracks on the ore dump; to use every precaution for the protection of life and property during the term of this contract.

"* * * to mine a minimum of at least eighty feet of tunnel, as above specified, during each fourteen-day period, provided, however, that this requirement shall not bind the contractors when circumstances beyond their control result in the mining of a lesser footage.

"To carry all compensation insurance for themselves and their employees and submit policy for the same for the inspection of the owner, or its authorized representatives;

to provide social security and pay for all old age pensions which may be required by any Federal or Idaho statute; to incur or suffer no encumbrances or liens against the above described premises or machinery; to do all things which shall be necessary to hold the company harmless, both in law and equity, from any liability for any act of the contractors conducting the above operations.

"To furnish all labor, including a blacksmith, for sharpening steel, making switches, repairing tracks, pipe lines, machinery or mining equipment where and when necessary; to furnish all replacement or renewal parts for all equipment using compressed air in the mine, provided, however, that the owner's mechanics will do the actual repairing or replacement of parts on such equipment as and when the owner may decide such action is necessary; to furnish all necessary explosives for the mining operations, including dynamite, caps and fuse, and to handle, store and use the same in accordance with the Federal and State laws, hereby releasing owner from any and all liability which may result from such use.

\* \* \* \*

"Upon any default of this agreement, to surrender to the owner, or its authorized representative, upon receipt of a ten days written notice, mailed to contractors, at Patterson, Idaho, possession of the premises, above described, including the cabins, all mining machinery and equipment, and the work theretofore done by said contractors shall inure to the benefit of the owners without any further payment whatsoever; and contractors hereby covenant that, if any legal process shall be necessary to remove them from any of the above described premises, they will pay all costs incurred thereby."

It was further contracted that:

"Time is of the essence of this agreement and it is mutually covenanted and agreed that, should any default be made of any of the terms of this agreement, the innocent party may, at its option, declare a forfeiture and terminate this agreement by a ten days written notice, mailed to the defaulting party, and addressed to Patterson, Idaho; and in such case the terms of this agreement shall become null and void and any and all payments made hereunder, or any

work done, shall inure to the benefit of the party receiving or holding the same."

About a month after the contract was entered into to wit, June 24, 1942, Gissell and Aguirre were killed. Thereupon, it appears from the testimony of Mellen, that "we started looking for two new partners." Then, Mellen testifies, "We took Mr. Duffy and Mr. Dirks up there from Atlanta and they looked over the ground and thought everything was satisfactory, so we went in to talk it over with Mr. Elliott (representative of the company) and got this new rate (referring to an increase per foot for tunneling work as well as an increase for each set of timbers installed) on account of them changing the heading of the mine. It threw us in 1,000 feet further, and instead of having two headings to drive on we had only one." "They (referring to Duffy and Dirks) started to work, and pretty soon they come out and hunted us up, McCoy and me, to tell us it was no dice. They didn't want to have anything to do with it without a change of machines. The liners had no steel attachments on them at all. Mr. Elliott said the Electric Company would not buy any new machines, so they (again referring to Duffy and Dirks) pulled right out and we were left again without any partners. That was the first of July and we run there until the 4th, and this Glenn Goddard and Frank Rutherford took over the place of Aguirre and Gissell. Q. What negotiations did you have with these last two men before they started working with you? A. We merely talked it over—how we were handling the ground and everything, and approximately how much we'd make, how the checks would be divided. Then they (Goddard and Rutherford) started to work." And while Goddard and Rutherford did not sign the contract of May 25th, 1942, they acquiesced in the terms and were paid and accepted the contract price for tunneling and timbering—they were not paid by the hour or day.

Sometime after the mutual termination of the contract, the company was notified it was subject to the payment of an unemployment compensation excise tax covering the work performed under the contract. A hearing was had before the Unemployment Compensation Division of the Industrial Accident Board, which determined the services rendered under and pursuant to the contract, were "services" deemed to be employment within the meaning of the

Unemployment Compensation Law. Thereafter, the General Electric Company, being dissatisfied with the decision of the Unemployment Compensation Division, appealed to the Industrial Accident Board. The appeal was heard by the Board September 2, 1943, at which time the matter was tried *de novo*. November 19, 1943, findings of fact and rulings of law were made and filed and on the same day the following order was entered thereon:

"WHEREFORE, IT IS HEREBY ORDERED, that the General Electric Company pay unemployment compensation contributions on the services rendered by the contractors operating under and pursuant to said agreement,"
from which the General Electric Company appeals to this court. It will be remembered the contract required that the development work "start on or before the first day of June, 1942" and that the drifts or cross-cuts be driven *"in the direction stipulated by the company or its authorized representatives * * *"*; that the contractors contracted "to perform all work in a good and miner-like manner at all times and *to the satisfaction of the owner, or its authorized representatives * * *;"* and that the contractors further contracted "to erect and install framed timber sets to be furnished by the owner; to install air, water and ventilator pipe and fittings, mine tracks and switches in a good workman-like manner *to the satisfaction of the owner, or its authorized representatives * * *"*

It is insisted the above quoted italicized provisions of the contract, together with the checking done by the company to see that the tunnel dimensions and timbering conformed to the specifications, gave the company such control as to create the relationship of master and servant.

On that point our attention is directed to the amendment of the Unemployment Compensation Law enacted by the 1941 Session of the Legislature (S. L. 1941, pp. 389, 393) and in particular, to the following provisions:

"(e) Services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this Act, unless and until it is shown to the satisfaction of the Board that—

"(1) Such individual has been and will continue to be

free from control or direction over the performance of such services both under his contract of hire and in fact; and

"(2) Such individual is customarily engaged in an independently established trade occupation, profession, or business of the same nature as that involved in the contract of service."

In *Joslin v. Idaho Times Publishing Co.*, 56 Ida. 242, 253, 254, 53 P. (2d) 323, this court passed upon the question as to whether a reservation in a contract of the right to supervise the work for the purpose of determining whether it is being done in accordance with the terms of the contract, created the relationship of master and servant, holding such a reservation did not have that effect.

In that case we pointed out:

" '* * * An independent contractor is one who, in rendering service, exercises an independent employment or occupation, and represents his employer only as to the results of his work, and not as to the means whereby it is to be accomplished.' "

and that—

" '* * * The fact that the work is to be done under the supervision of an architect, or that the employer has the right to make alterations, deviations, additions, and omissions from the contract, does not change the relation from that of an independent contractor to that of a mere servant.' "

and, further, that—

" '* * * a reservation by the employer of the right to supervise the work, for the purpose of merely determining whether it is being done in accordance with the contract, does not affect the independence of the relation.

" '* * * *The fact that the work is to be done under the direction and to the satisfaction of certain persons representing the employer does not of itself render the person contracted with to do the work a servant.' "* (Emphasis ours.)

In determining, in the case at bar, whether the contract in question establishes the relationship of master and ser-

vant between the company and the above named persons, or that of independent contractors, consideration must also be given to the following terms and conditions of the contract whereby such persons contracted: to excavate the drifts to a stated width and height, at a stated sum per foot; *to furnish all labor;* to furnish all necessary explosives; to complete at least 80 feet of tunnel during each fourteen-day period; to carry all compensation insurance for themselves and employees; to provide social security and pay all the old age pensions which might be required by either federal or state statute; to incur or suffer no encumbrances or liens against the premises or machinery. And furthermore, it will have been noted that *time* is made the essence of the contract (applicable to the completion of the tunnel as well as to other matters), and that in case "default be made of any of the terms of this agreement, the innocent party may, at its option, declare a forfeiture and terminate this agreement by ten days' written notice."

If the contract in question was made in good faith, and not for the purpose of avoiding the payment of the unemployment excise tax, and there is neither charge nor proof it was not made in good faith, nor that it was made for the purpose of avoiding payment of that tax, then, it must follow Mellen and his associates were independent contractors and not employees of the company. To hold the contract established the relationship of master and servant, it would, at least, be necessary to strike from it all the above stated material terms and conditions, and the effect of that would be to deny freedom of contract.

The order of the Board is reversed and the cause remanded with directions to dismiss the proceeding. Costs awarded to appellant.

Ailshie, C.J., and Budge and Givens, JJ., concur.

Miller, J., deeming himself to be disqualified, did not sit at the hearing or participate in the decision.