192 P.2d 599

**CONTINENTAL OIL CO. v. UNEMPLOY-
MENT COMPENSATION DIVISION
OF INDUSTRIAL ACCIDENT BOARD.**

No. 7334.

Supreme Court of Idaho.

Oct. 16, 1947.

On Rehearing March 30, 1948.

Ralph R. Breshears, of Boise, for appellant.

Robert Ailshie, Atty. Gen., Sherman F. Furey, Jr., Asst. Atty. Gen., and David Doane, Asst. Atty. Gen., for respondent.

Robert E. Smylie, Atty. Gen., and Sherman F. Furey, Jr., Asst. Atty. Gen., for respondent on rehearing.

Oscar W. Worthwine, of Boise, Burton W. Musser and J. T. Hammond, Jr., both of Salt Lake City, amici curiae.

HOLDEN, Justice.

For many years prior to the commencement of this proceeding the Continental Oil Company, hereinafter called the Company, was and still is engaged in the business of wholesaling gasoline, kerosene, oil, lubricants, and other similar products at many places in this state, and at certain places in the state maintained and operated bulk plants or stations.

December 5, 1945, the Company received a letter from Victor H. Self, a Deputy Commissioner of the Treasury Department (in reply to its letter to the deputy commissioner dated October 11, 1945), holding the Company was not the employer of its commission representatives and their helpers and, therefore, not liable for the payment of an unemployment excise tax. Following the receipt of that letter and on January 2, 1946, the Company filed a claim with the Unemployment Compensation Division of the Industrial Accident Board for a refund of excise taxes, in the sum of $14,826.50, paid by it between January 1, 1942, and September 30, 1945. Thereafter, March 25, 1946, the claim for refund was denied by an order of the duly authorized representative of the Board. From the ruling of the representative the Company appealed to the Board. The appeal was heard July 10, 1946. September 12, 1946, findings of fact were made and filed and the following order entered thereon by the Board: "Wherefore, it is hereby ordered, that the determination, heretofore made on the 25th day of March, 1946 by a duly authorized representative of the Industrial Accident Board with respect to the appel-

lant herein, be and the same is hereby affirmed." From that order the Company prosecuted an appeal to this court.

The appeal presents the question as to whether the Company is liable for the payment of an excise tax under the provisions of our Unemployment Compensation Law on persons performing services for it in this state, including the services of its bulk station operators as well as persons employed by such bulk station operators.

We will first discuss and dispose of the Company's contention, that "The Idaho Unemployment Compensation Law as construed by the Idaho Supreme Court, does not cover any relationship other than the common law relationship of master and servant," and that the common law test of the relationship of master and servant should apply and govern the determination of coverage, citing and relying upon, among other cases, Joslin v. Idaho Times Publishing Co., 56 Idaho 242, 53 P.2d 323; Idaho Times Publishing Company v. Industrial Accident Board, 63 Idaho 720, 126 P.2d 573, and In re General Election Company, 66 Idaho 91, 156 P.2d 190.

Joslin v. Idaho Times Publishing Co., supra, was an action at law to recover damages for personal injuries. It was not a proceeding to recover compensation under our Unemployment Compensation Law. The question as to whether the common law test of the relationship of master and servant should apply to and govern the determination of coverage, was neither presented nor passed on. Nor was that question presented in Idaho Times Publishing Co. v. Industrial Accident Board, supra. In that case the question presented for decision was as to whether, under the then applicable provisions of our Unemployment Compensation Law, the Times carriers were independent contractors or employees of the Times. The Board found the carriers were free from control, but that it had not been shown to its satisfaction such carriers were "customarily engaged in an independently established trade, profession or business." [63 Idaho 720, 126 P.2d 577] This court affirmed the finding the route carriers were free from the control of the publisher but pointed out the Board's finding, to the effect the route carriers were not "customarily engaged in an independently established trade, profession or business" was "contrary to the uncontradicted evidence." The route carriers being free from the control of the publisher, and the findings of the Board, as above stated, being contrary to the uncontradicted evidence, this court held the Times was not required to pay contributions on the earnings of the carriers. The question as to whether the common law test of the relationship of master and servant should apply and govern the determination of coverage, was not discussed, considered or passed on.

In Re General Electric Company, supra, it appears the Company contemplated the development of a mine it owned near Pat-

terson, Idaho, and that Thomas H. Mellen and Eusebio Aguirre had been engaged in the business of contracting "cross-cutting" and "drifting". It further appears a representative of the General Electric told Mellen of the contemplated development work and thereupon a group composed of Mellen, Aguirre, McCoy and Gissell went to Patterson and looked the property over and while there discussed and "threshed out" the terms of a contract for driving a tunnel. Shortly thereafter a written contract was entered into between General Electric and that group for driving a tunnel. The question presented for decision in that case was as to whether the above mentioned group was, under the terms of the contract, employees of General Electric or independent contractors. In the determination of that question, this court at once turned to and quoted paragraphs 1 and 2 (66 Idaho 91, at pages 96, 97, 156 P.2d 190, at page 193) of subdivision "(e)" of our Unemployment Compensation Law, as amended by the 1941 session of the legislature (S.L.1941, pp. 389, 393). In the course of discussing the contention certain provisions of the contract, to wit, that drifts or cross-cuts were to be driven in "the direction stipulated by the company or its authorized representatives", and that the contractors were "To perform all work in a good and miner-like manner" "to the satisfaction of the owner, or its authorized representatives", this court pointed out: " 'The fact that the work is to be done under the direction and to the satisfaction of certain persons representing the employer does not of *itself* render the person contracted with to do the work a servant'." (Emphasis added.)

No case has been called to our attention, and we have found none, where, as in the case at bar, the question was squarely presented to this court as to whether, in determining coverage, the common law test of relationship of master and servant should govern or the provisions of our Unemployment Compensation Law. In the determination of that question it is necessary to consider and construe the applicable provisions of our Unemployment Compensation Law in force at the time the "Bulk Station Commission Agreement" in question here was made. That brings us to the 1945 amendment (Chap. 203, 1945 S. L., p. 348). Section 43-2202 provides:

[43-2202, I.C.A.] "Declaration of State Public Policy.—As a guide to the interpretation and application of this Act, the public policy of this State is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this State. Involuntary unemployment is therefore a subject of national and state interest and concern which requires appropriate action to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security

requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that, in its considered judgment, the public good, and the general welfare of the citizens of this State require the enactment of this measure, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

"This Law is enacted for the purpose of securing for this State the maximum benefits of the Act of Congress, approved August 14, 1935, known as 'Social Security Act' as amended and to enable the workmen of Idaho to benefit at the earliest possible date from the provisions of said Act, and so far as possible shall be interpreted to conform to the provisions thereof and to the decisions of the courts thereon."

Having thus clearly stated the public policy of the state, the legislature then, and as a part of its declaration, stated the object it sought to accomplish by the Unemployment Compensation Law, an object and purpose, it appears, wholly foreign to the common law relationship of master and servant. In addition to having thus declared the public policy of the state, and apparently for the express purpose of making it clear the common law test of the relationship of master and servant should not govern in determining liability to pay the unemployment tax, the legislature by subdivision (d) of sec. 43-2506, provided (1945 Sess.Laws, chap. 203, sec. 43-2506 (d), p. 365) : "The relationship between an employer and the individuals who perform services for him shall, *for the purposes of this Act, be construed, in all cases, in accordance with the provisions and definitions of this Act, and no rule, either of the common law or enacted by statute, contrary to the provisions and definitions of this Act shall apply to or affect such relationship.*" (Emphasis added).

Our Unemployment Compensation Law was first enacted in 1936, Sess.Laws 1935, 3d Extra Session, chap. 12, p. 20. Sec 43-2202, above quoted, is a reenactment of section 2 of the original Unemployment Compensation Law. There has been no change in the public policy of this state as originally declared by section 2. It has remained the same as when originally declared and, while the legislature was desirous of securing the maximum benefits under the Social Security Act, 42 U.S.C.A. § 301 et seq., it made it clear the common law test of the relationship of master and servant, nevertheless, should not govern in determining liability to pay an unemployment excise tax but that, on the other hand,

"the provisions and definitions of this Act" (Unemployment Compensation Law) should apply.

It is provided by sec. 43-2311 of chapter 203, 1945 Sess.Laws, p. 350:

[Sec. 43-2311] "Excepted Employment.— The term 'covered employment' shall not include—

"(a)  *  *  *
"(b)  *  *  *
"(c)  *  *  *
"(d)  *  *  *
"(e)  *  *  *
"(f)  *  *  *
"(g)  *  *  *
"(h)  *  *  *

"(i) Services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this Act, unless and until it is shown to the satisfaction of the Board that such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of hire and in fact."

The decisive question is, then, were the operators of the bulk plants or stations free from the control or direction of the Company in the performance of their services, both under the "Bulk Station Commission Agreement" and in fact. The Company says there is no material evidence outside the agreement and that the relationship is governed by the contract.

We, therefore, turn to the consideration of the written "Bulk Station Commission Agreement" entered into between each operator and the Company. That agreement provides, among other things: That the "representative" will "Keep the property in good condition"; that he will "Solicit orders and make deliveries to the trade, take receipts from all parties to whom deliveries are made, reporting the receipt, delivery, and shipment of stock *according to instructions from Conoco* [appellant] and satisfactorily account for all stocks intrusted to him"; "Fill barrels and other packages from bulk stock, haul empty packages, make shipments and transfers *as directed,* and do the necessary work for the proper care of the business and stock"; "Faithfully transact the *business in his charge* and *make reports,* all in accordance with this agreement *and instructions* from the Division Manager of Conoco"; *Collect and remit promptly for all sales made ;"* that "Conoco *will furnish all forms required* in the transaction of said business"; that Conoco "will furnish the necessary license (except auto or truck licenses) *to cover the business of Conoco* and insurance on buildings, equipment (other than automotive equipment), and merchandise stocks, and will pay exchange on remittances"; that "Representative agrees to pay all expenses which may be incurred in the ordinary operation of said plant and agrees to furnish suitable automotive equipment with which

to make deliveries, and to pay all maintenance of same (including gasoline and oil), and to pay for light, power, water, ice, heat, telephone, telegrams, and postage where necessary in the proper conduct of said plant and the business operated therefrom, and reimburse Conoco for all license and other payments which may be made by Conoco under any motor carrier law by reason of said operations"; that "Representative agrees to comply with all the following agreements in this subparagraph E, so far as such agreement can legally be made: To accept full and exclusive liability for and indemnify Conoco against the payment of any and all contributions and taxes for unemployment insurance or compensation, old age pensions, annuities or otherwise, now or hereafter imposed by the Federal Social Security Act and any similar law or enactment of the United States or of any state, district, or jurisdiction, measured by the wages, salaries or other compensations paid to persons employed by Representative in connection with the performance of the work hereby provided for, so far as Representative or Conoco may be required to pay or collect or deduct and pay such contributions and taxes, and also any and all such contributions and taxes measured by the compensation to be paid to Representative hereunder, which Representative is required to pay or which Conoco is required to collect or deduct and pay, and to register as an employe under said laws and furnish Conoco with such employe registration number thereunder"; that "If Representative is not now registered as an employer under all such applicable laws, but employs anyone to assist Representative in operations hereunder at the time this agreement becomes effective, Representative shall immediately register as an employer under any and all such laws. If at such effective date Representative does not employ anyone to assist Representative in such operations, but thereafter employs any person or persons for that purpose, Representative will immediately register as an employer under said laws. In either such case Representative will immediately "furnish evidence of such registration to Conoco, together with the registration numbers of Representative as employer and of Representative's employes thereunder. Representative will comply as such employer, with all such laws, with respect to all operations hereunder, and furnish Conoco evidence of such compliance from time to time"; that *Representative shall, on request of Conoco, from time to time, furnish Conoco, in form satisfactory to Conoco, a list of all persons employed by Representative in connection with operations hereunder,* including a *statement of the compensation paid to or due to each of such persons by Representative,* and any and all other information which may be reasonably required by Conoco in connection with compliance with any such enactment or law, *including detailed evidence of expenses of Representative em-*

braced in the total amount to be paid to Representative for commissions and expenses as above *stated and in form satisfactory to Conoco"*; that *"Representative agrees to give such bond as is required by Conoco with a surety company designated by Conoco as a surety,* and to procure public liability insurance and property damage insurance covering all automotive equipment used by him in the performance of this agreement, in the amount of not less than $10,000 for each accident for injury or death of one person injured or killed, and the amount of not less than $20,000.00 where more than one person is injured or killed in the same accident, and said property damage insurance to be in the amount of not less than $5,000.00 for each accident. Such insurance policy or policies shall be in a company or companies approved by Conoco, and insurance policy or policies approved by Conoco shall be delivered to Conoco, and shall provide *that loss shall be payable to representative and/ or Conoco, as Conoco may desire"*; that *"Representative shall not have the right to conduct any other separate business at said plant without Conoco's consent.* If any such consent is given, such separate business shall be under Representative's sole control unless otherwise expressly agreed in writing by Conoco. *Representative shall not permit any separate business handled by Representative at or from said plant to interfere with Representative's duties to Conoco under this agreement,* including the duties in connection with the petroleum products business of Conoco, nor shall *said separate business interfere with the appearance of said plant for the handling of gasoline, motor fuel and petroleum products, nor with any advertising relating to any of the petroleum products furnished by Conoco. Representative shall make no alterations in additions or improvements to said premises without Conoco's written consent, and place no sign on said premises or adjacent thereto, unless and until the same shall have been first approved in writing by Conoco"*; that "Any and all parties employed by Representative to assist Representative in connection with the business to be conducted hereunder by Representative for Conoco, shall be employes of Representative, and shall in no event be considered employes of Conoco, and shall be hired, paid, and discharged by Representative, and entirely under the direction and control of, and their duties defined by Representative and Representative shall be liable to Conoco for all loss or damage caused by their acts; and provided further that Representative shall permit no assistant or other person who is not of mature age and judgment to store, handle, ship, or deliver any refined oil, or gasoline in connection with *operations* hereunder, and that Representative shall cause *all such operations to be carried out in such manner as may from time to time be designated by Conoco's Division Manager"*; that *"Representative agrees during the term of this*

*agreement not to act as representative or agent of any competitor of Conoco or to sell any product competitive to any product handled by Conoco";* that the agreement will "continue until canceled by ten days' written notice by either party to the other; provided that *if Representative fails in any respect to comply with this "agreement, Conoco may immediately terminate it without notice to Representative"* (emphasis added); that the services of the operator, in managing and operating a bulk station, are paid for in commissions.

Summarizing: It appears the Company owns the bulk stations (33) operated by its "representatives"; that the Company owns the petroleum products "stocked" in the plants, and sold by its representatives; that only the Company's petroleum products can be sold by the operators; that the operators can not conduct *any other* business in the plants without the Company's consent; that no separate business shall interfere with the appearance of the plants, "nor with any advertising relating to any of the petroleum products" of the Company; that no sign shall be placed on a plant "or adjacent thereto, unless and until the same shall have been first approved in writing by" the Company; that the operators shall solicit orders and make deliveries to the trade *according to instructions from the Company,* and *faithfully account for* all *stocks intrusted* to them; that the operators shall "fill barrels and other packages from bulk stock, haul empty packages, make shipments and transfers *as directed;"* that the "representatives" will *satisfactorily transact* the business in their charge and *make reports,* all in accordance with the agreement and *instructions* from the *division manager; "collect and remit promptly for all sales made;"* that the Company furnishes *all forms required* in the transaction of the bulk station business; that representatives shall, on request of the Company, from time to time, furnish the Company, in form satisfactory to it, *a list of all persons employed by them* in connection with the operation of the plants, including a *statement of the compensation paid to or due to each of such persons;* that the representative shall cause *all* operations to be *carried out* in such manner as may from time to time be designated by Conoco's division manager; that if representatives fail *in any respect* to *comply with the agreement,* the Company can *"immediately terminate it without notice",* that the services of the representatives for operating the bulk stations are paid for in commissions. (Emphasis added).

Notwithstanding the provision requiring the operators to *accept full* and *exclusive liability* for the payment of unemployment contributions and to register as employers, and similar provisions, the fact remains, nevertheless, the contract is drawn so as to give the Company the control, or the right to control, its representatives in

every substantial particular in or about the conduct of the business transacted at bulk stations. The representatives do not sell their own petroleum products, they sell the Company's and *strictly account* to the Company for all sales made and on forms provided by the Company. In fact, the representatives can not even put up a sign without first obtaining the consent of the Company. Moreover, and finally, if a representative fails to comply with any one of the terms of the "Bulk Station Commission Agreement", *to be by him done or performed,* the Company is given the right, *without notice,* to immediately terminate the agreement—which amounts to giving the Company the right, in such a circumstance, to at once discharge the representative.

■ Furthermore, the fact the compensation of the representatives for services performed by them for the Company is paid in the form of "commissions" cannot change the contruction given the contract. It rather supports the construction, in this: Section 43-2308 (Chap. 203, 1945 Sess. Laws, p. 349) provides: [Sec. 43-2308] "Wages.—The term 'wages' where used in this Act shall, for the purpose of this Act, mean all remuneration payable for personal services, including *commissions,* bonuses, and dismissal wages, and the cash value of all remuneration payable in any medium other than money. The reasonable cash value of remuneration payable in any other medium than money shall be estimated and determined as the Board shall by regulations prescribe." (Emphasis added)

It follows the order appealed from must be affirmed, and it is so ordered. Costs awarded to respondent.

GIVENS, MILLER and HYATT, JJ., concur.

### On Rehearing

HOLDEN, Justice.

The opinion in this case was handed down October 16, 1947. Thereafter, upon the petition of appellant, Continental Oil Company, a rehearing was ordered and, further, and upon the petition of the Utah Oil Refining Company, leave was granted to it and its counsel, Oscar W. Worthwine, and to Burton W. Musser and J. T. Hammond, Jr., to appear as amici curiæ, file a brief and join in the oral argument on rehearing, for the purpose of assisting counsel for appellant. February 20, 1948, the cause was reheard

On rehearing it was vigorously insisted appellant's operators "are independent contractors in the category of small business men for whose benefit the Unemployment Compensation Law, Code 1932, § 43-2201 et seq., as added by Laws 1945, c. 203, was not enacted," citing federal cases. It seems to have been overlooked that we did not pass on the question as to whether, under the Federal Social Security Act, 42 U.S.

C.A. § 301 et seq., appellant's operators were, or were not, independent contractors. What we held was, that under our statute, the operators were not independent contractors. While not unmindful of the Federal Social Security Act, we were, of course, primarily concerned with the construction of our own statute. However, it seems our holding is amply supported by Schwing v. United States, 3 Cir., 165 F. 2d 518; Atlantic Coast Life Ins. Co. v. United States, D. C., Eastern Dist. of So. Car., 76 F.Supp. 627.

Furthermore, the Social Security Act "does not call for a surrender by the states of powers essential to their quasi-sovereign existence" (Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 893, 81 L.Ed. 1279, 109 A.L.R. 1293, 1307). "A wide range of judgment is given to the several states as to the particular type of statute to be spread upon their books" (Steward Machine Co. v. Davis, supra; State v. Robinson, 59 Idaho 485, 493, 83 P. 2d 983, 986); nor is any attempt made to dictate how a state shall construe its own legislation on social security.

After a careful re-examination of the questions presented on the original hearing, as well as those presented on rehearing, we find no sound reason for departing from the conclusion reached in the foregoing opinion.

GIVENS, C. J., and MILLER and HYATT, JJ., concur.